# Exhibit A – First Amended Complaint

Electronically Filed
4/27/2021 3:53 PM
Steven D. Grierson
CLERK OF THE COURT

PAOLA ARMENI
Nevada Bar No. 8537
Email: parmeni@clarkhill.com
JEREMY J. THOMPSON
Nevada Bar No. 12503
Email: jthompson@clarkhill.com
CLARK HILL PLLC
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
Telephone:   (702) 862-8300
Facsimile:   (702) 862-8400
*Attorneys for Plaintiffs,* Morgan Family

**EIGHTH JUDICIAL DISTRICT COURT**

**CLARK COUNTY, NEVADA**

| | |
|---|---|
| BONNIE LOPEZ, individually as sister and Special Administrator for the Estate of MELODY MORGAN, deceased; COLLEEN LACKEY, individually as mother of MELODY MORGAN, deceased, | CASE NO.: A-20-814296-C<br><br>DEPT NO.: 1 |
| Plaintiffs, | |
| vs. | **FIRST AMENDED COMPLAINT** |
| | **JURY TRIAL DEMAND** |
| THE STATE OF NEVADA ex rel. NEVADA DEPARTMENT OF CORRECTIONS, WARDEN DWIGHT NEVEN, individually; GARY PICCININI, ASSISTANT WARDEN, individually; BRYAN SHIELDS, individually; OFFICER JOEL TYNNING, individually; OFFICER KARISSA CURRIER; OFFICER JAZMINA FLANAGAN; NURSE JANE BALAO; NURSE BRIGIDO BAYAWA; NURSE LEILANI FLORES; NURSE ROSEMARY MCCRARY; NURSE MA LITA SASTRILLO; NURSE CHRIS SHIELDS; DOES I through X; and ROE ENTITIES I through X, inclusive, | |
| Defendants. | |

     Plaintiffs THE ESTATE OF MELODY MORGAN, BONNIE LOPEZ, individually as

sister and as administrator of the Estate of MELODY MORGAN, deceased, and COLLEEN

LACKEY, individually as mother of MELODY MORGAN, deceased, ("Morgan Family"), by

and through counsel of record, the law firm Clark Hill PLC, hereby complain and allege as follows:

## I.

## INTRODUCTION

1. This action is brought by the Plaintiffs to redress violations of 42 U.S.C. § 1983 and various state laws committed in the State of Nevada and perpetrated by the Defendants individually, while acting under color of state law, and/or custom or policy of certain rights secured to the Plaintiffs by the United States Constitution and the laws of the State of Nevada.

## II.

## JURISDICTION AND VENUE

2. This is a civil action for damages under federal and state law brought, in part, pursuant to 42 U.S.C. Section 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States of America.

3. This Court has personal jurisdiction over all Defendants as, at all times relevant hereto, they either resided or did business regularly and systematically in Clark County, Nevada, and their conduct at issue occurred in Clark County, Nevada. Thus, jurisdiction and venue are proper in Clark County, Nevada.

4. This Complaint is timely filed within the applicable statute of limitations period.

5. That this civil action arising from actions occurring within County of Clark, State of Nevada, involving an amount in controversy in excess of the sum of $75,000.00, exclusive of costs and interests, thereby giving this Court jurisdiction over this matter.

6. Plaintiffs hereby demand a trial of their action by jury.

## III.

## THE PARTIES

7. Plaintiff Bonnie Lopez ("Lopez") is the duly appointed, qualified, and acting special administrator for the Estate of Melody Morgan, deceased, and is the sister of Melody Morgan, who died in the manner alleged below on April 28, 2018. Plaintiff is over the age of

eighteen and is a citizen of Clark County, Nevada. Plaintiff Lopez brings this action on behalf of the estate and for the benefit of the heirs of the estate as well as in her own capacity as the sister and heir to the decedent.

8.    Plaintiff Colleen Lackey ("Lackey") is the mother of Melody Morgan as well as Bonnie Lopez. Plaintiff Lackey is over the age of eighteen and is a citizen of Nye County, Nevada. She brings this action in her own capacity as the mother and as an heir to the decedent.

9.    Upon information and belief, Defendant Gary Piccinini is and was at all times relevant the Associate Warden of the Florence McClure Women's Correctional Center and is a resident of the State of Nevada.

10.    Upon information and belief, Defendant Dwight Neven is and was at all times relevant the Warden of the Florence McClure Women's Correctional Center and is a resident of the State of Nevada.

11.    Upon information and belief, Defendant Bryan Shields is and was at all times relevant an Inspector and/or Officer employed by the Nevada Department of Corrections and is a resident of the State of Nevada.

12.    Upon information and belief, Defendant Joel Tynning is and was at all times relevant a Corrections Officer employed by the Nevada Department of Corrections and is a resident of the State of Nevada.

13.    Defendant Karissa Currier is and was at all times relevant a Corrections Officer employed by the Nevada Department of Corrections and is a resident of the State of Nevada.

14.    Defendant Jazmina Flanigan is and was at all times relevant a Corrections Officer employed by the Nevada Department of Corrections and is a resident of the State of Nevada.

15.    Defendant Jane Balao is and was at all times relevant a nurse employed by the Nevada Department of Corrections and is a resident of the State of Nevada.

16.    Defendant Brigado Bayawa is and was at all times relevant a nurse employed by the Nevada Department of Corrections and is a resident of the State of Nevada.

17.     Defendant Leilani Flores is and was at all times relevant a nurse employed by the Nevada Department of Corrections and is a resident of the State of Nevada.

18.     Defendant Rosemary McCrary is and was at all times relevant a nurse employed by the Nevada Department of Corrections and is a resident of the State of Nevada.

19.     Defendant Ma Lita Sastrillo is and was at all times relevant a nurse employed by the Nevada Department of Corrections and is a resident of the State of Nevada.

20.     Defendant Chris Shields is and was at all times relevant a nurse employed by the Nevada Department of Corrections and is a resident of the State of Nevada.

21.     The individuals identified in paragraphs 15 through 20 are collectively the "Nursing Defendants."

22.     Defendant State of Nevada ex rel. Nevada Department of Corrections ("NDOC") is a division and/or department of the State of Nevada.

23.     Defendants are sued individually in either their personal capacities (federal claims) and/or official capacity depending on the claims alleged and were acting under color of state law and/or custom or policy of certain rights.

24.     Defendants, under color of state law, have caused the decedent to be deprived of her constitutional rights.

25.     Defendants were the agents, servants, employers and/or employees of each other and were acting within the course and scope of said relationship.

26.     Plaintiffs allege that each of the Defendants performed, participated in, aided and/or abetted in such manner the acts averred herein, proximately caused the damages averred below, and each is liable to Plaintiff for the damages and other relief sought herein.

27.     That the true names and capacities, whether individual, corporate, associates, co-partnership, or otherwise of Defendants DOES 1 through 100 and ROE Corporations 1 through 100, are unknown to Plaintiffs who therefore sues said defendants by such fictitious names. Plaintiffs are informed and believe and thereon alleges that each of the defendants designated as DOES 1 through 100 and ROE Corporations 1 through 100 are responsible in some manner for

the events and happenings referred to in this action and proximately caused damages to Plaintiffs as herein alleged.

### IV.

### **FACTUAL ALLEGATIONS**

28.   The decedent Melody Morgan ("Morgan") was born on xx/xx/1993 in California. As a child at or about the age of seven, she moved to Las Vegas, Nevada with her family.

29.    Morgan was artistic and enjoyed drawing, painting, and crafts. Morgan maintained a close and loving relationship with her mother and sister.

30.   Morgan suffered from Von Willebrand disease and from having an arachnoid cyst in her brain. She also suffered from asthma, fibroid and/or ovarian cysts, as well as seizures and migraines. She was adjudicated as disabled and, as a result, she received Social Security disability benefits.

31.   Morgan was diagnosed with bipolar disorder, schizophrenia, and multiple personality disorder. She had a history of approximately three psychiatric hospitalizations.

32.   Morgan also had a history of suicidal ideations and attempts to commit suicide. Her first attempt to commit suicide was at the age of fourteen.

33.   In or about December 2012, Morgan was arrested and detained for various criminal charges.

34.   After her arrest and while detained, Morgan was placed on suicide watch for suicidal ideation. On or about December 21, 2012, she tried to commit suicide. Upon information and belief, she was placed on suicide watch after her attempt to commit suicide.

35.   Based on a competency evaluation performed in 2013, it was determined that she should be considered a suicide risk until she was clinically stabilized.

36.   In or about December 2013, Morgan pled guilty prior to trial and was sentenced to a period of incarceration in the Nevada Department of Corrections. She was originally housed at Florence McClure Women's Correctional Center located in Las Vegas, Nevada.

37.   At all times relevant, Defendants were aware or should have been aware that

Morgan was at risk to commit suicide.

38.    Despite her disabilities and known risk of suicide, Morgan was transferred to Jean Conservation Camp.

39.    On or about April 19, 2018, Morgan walked away from Jean Conservation Camp with another inmate.

40.    On or about April 23, 2018, Officer Shields contacted Plaintiff Lackey and requested her assistance in locating Morgan. When Plaintiff Lackey spoke to Officer Shields, she informed him that Morgan was highly unstable, that she has hurt herself and has attempted suicide in the past, and that Morgan would hurt herself and/or attempt to commit suicide once Morgan was re-captured and returned to incarceration. Plaintiff Lackey informed Officer Shields that Morgan would need to be on suicide watch and/or in the psychiatric ward once she returned to incarceration.

41.    Officer Shields promised Plaintiff Lackey that upon locating and recapturing Morgan that she would be placed on suicide watch.

42.    Plaintiff Lackey agreed to assist Officer Shields in locating Morgan.  Plaintiff Lackey informed Officer Shields that if Morgan became aware that her mother assisted in locating her, then Morgan would be even more likely to hurt herself and/or commit suicide.

43.    Morgan contacted her mother after walking away from the camp.

44.    Plaintiff Lackey informed Officer Shields of Morgan's location.

45.    On or about April 28, 2018, Morgan was located and arrested.

46.    Upon information and belief, during her arrest, Morgan was informed that her mother had assisted in locating her.

47.    After Morgan was located and arrested, Officer Shields contacted Plaintiff Lackey.  She reiterated to Officer Shields that Morgan needed to be placed on suicide watch for her own safety due to the high risk of her committing suicide.  Officer Shields promised that Morgan would be placed on suicide watch upon her return to the detention or correctional facility.

48.   Officer Shields notified Defendant Currier of Plaintiff Lackey's concern about the high risk of Morgan committing suicide.

49.   Defendant Currier alleges that she notified Defendant Flanigan of Plaintiff Lackey's concern about the high risk of Morgan committing suicide.

50.   Defendant Flanigan alleges that Defendant Currier never notified her of Plaintiff Lackey's concern about the high risk of Morgan committing suicide

51.   Morgan was transported to Florence McClure Women's Correctional Center.

52.   Defendants Officer Shields, Neven, Piccinini, Currier and Flanigan failed to adequately communicate to Florence McClure Women's Correctional Center staff and/or officers that Morgan was at risk of committing suicide and failed to sufficiently instruct staff and/or officers to supervise Morgan under proper suicide prevention policies and protocols.

53.   Upon her return to Florence McClure Women's Correction Center, no Receiving Screening/Intake Screening was conducted by nursing staff to determine Morgan's urgent, emergent, and/or ongoing healthcare needs, including the critical issue of identifying suicide risk.

54.   Nurses Flores and Sastrillo admitted during the post-investigative process ██████████████████████████████████████████████[1] Medical Directive #135 *Receiving Screening*, which requires all inmates to be assessed by nursing staff at Intake to determine their medical needs. *See* **Affidavit of Merit by Kimberly M. Pearson, MHA, MBA, RN, CCHP attached hereto as Exhibit 1**.

55.   Nurse Flores, the Director of Nursing, ████████████████████████████████████████████████████. Nurse Sastrillo, the Nursing Supervisor, ████████████████████████████████████████████████████████████

[1] Pursuant to the Stipulated Protective Order, this information has been deemed Confidential pursuant to NAC 284.718(8) and therefore has been redacted.

7

56.   Within 48 hours of her return to the correctional center, Defendants left Morgan alone in her cell without adequate supervision.  She was discovered unresponsive hanging in her cell during a normally scheduled routine check by a corrections officer.

57.   Upon information and belief, Defendant Tynning knew or should have known that Morgan was at a high risk of committing suicide and failed to adequately supervise Morgan while she was in custody by leaving her alone in her cell and by providing her access to materials that allowed her to commit suicide.

58.   Morgan strangled herself by tying a bedsheet around her neck and to the upper portion of the bunk bed.

59.   The emergency response that followed when Morgan was found to be hanging in her cell revealed a delay in access to care and insufficient resuscitative efforts.   Officers (with keys to the cell) did not "cut down" Morgan from the bunk with a cut down tool (or similar tool) and did not initiate CPR (cardiopulmonary resuscitation.)  They waited until the medical team arrived; then opened the cell door; and nursing staff used bandage scissors to cut the sheet and lower Ms. Morgan to the floor in order to initiate resuscitative efforts.

60.   And, while CPR compressions and the use of an AED (automatic external defibrillator) were initiated, compressions were at times ineffective, but moreover, there was no appropriate positioning and opening of the airway nor the administration of breaths as required by Basic Life Support algorithms until approximately six (6) minutes into the resuscitative process - in part due to the lack of appropriate and necessary equipment (oxygen mask) and lack of appropriate utilization of the equipment (hook up to oxygen tank).  Morgan was without oxygenation for well over six minutes.

61.   Emergency medical services arrived and Morgan was transported to University

---

[2] Pursuant to the Stipulated Protective Order, this information has been deemed Confidential pursuant to NAC 284.718(8) and therefore has been redacted.

Medical Center.  The North Las Vegas Fire Department records reveal that upon arrival to the prison, they were delayed in obtaining initial access to Morgan because of being held in the Sally Port upon arrival.  It was also documented that they were again delayed in transporting Morgan to the hospital because "the ambulance was held in the Sally Port for several minutes while prison personnel traded out personnel and checked the ambulance several times."

62.     All life-saving measures failed and Morgan was pronounced dead on April 28, 2018.

63.     While at the hospital, Defendant Piccinini stated to Plaintiff Lackey that Morgan was only left alone for a couple minutes.

64.     Despite knowledge and notice of Morgan's mental health history and that Morgan was at risk to commit suicide, Defendants failed to place Morgan on suicide watch and failed to carefully monitor her. Defendants failed to take preventative measures to ensure Plaintiff's safety by providing her with a bed sheet and/or blanket.

65.     Defendant Nevada Department of Corrections failed to implement and/or follow adequate suicide prevention policies and/or protocols and to train its officers and/or employees on their responsibilities to ensure inmate's health and safety to known risks and attempts of suicide.

66.     Defendant Nevada Department of Corrections failed to provide access to timely emergency care as the responding fire department was delayed getting into and out of the facility.

67.     Nursing Defendants failed to follow and implement established policies set forth to identify patient healthcare needs and risks and they failed to train and supervise staff.

68.     Defendant Nevada Department of Corrections and/or Nursing Defendants failed to provide and have necessary emergency equipment available in the instance of a suicide.

69.     Defendant NDOC is vicariously liable for the torts of their employees under the doctrine of respondeat superior.

70.     Defendants failed to implement and or follow adequate suicide prevention procedures.

71.     As a direct and proximate result of Defendants' deliberate indifference, Plaintiffs Lackey and Lopez were deprived of their daughter and sister's care, comfort, love, protection, advice, society, and physical assistance in addition to expectations of support, maintenance and other pecuniary benefits.

**V.**

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**42 U.S.C. § 1983 - EIGHTH AMENDMENT - DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED**

**PLAINTIFF ESTATE AGAINST ALL DEFENDANTS EXCEPT DEFENDANT NDOC**

72.     Plaintiff re-allege and incorporate the allegations set forth above as though fully alleged herein.

73.      Suicide is clearly a serious medical need, and prison officials can violate the Eighth Amendment of the United States Constitution when they ignore an inmate's suicide risk.

74.     Various district courts in the Ninth Circuit have held that the Eighth Amendment requires "a basic program to identify, treat, and supervise inmates at risk for suicide."

75.     Defendants knew of Morgan's vulnerability to suicide because she had a history of previous failed suicide attempts while in custody and because Morgan's mother informed Officer Shields that Morgan was suicidal. Morgan's mother repeatedly provided notice to Defendants via Officer Shields that Morgan was at risk of committing suicide and complied with Officer Shield's requests for assistance based on his representation that Morgan would be placed under proper supervision and suicide prevention protocols. Defendants were required to take adequate measures in response to Morgan's known suicide risk. At a minimum, Defendants should have informed Florence McClure Women's Correctional Center staff that Morgan was suicidal, should have adequately supervised Morgan while she was in custody, should have

implemented and followed adequate suicide prevention policies and protocols, and/or should have ensured that Morgan did not have access to materials to assist in attempting to commit suicide.

76.     Defendants disregarded Morgan's known risk of suicide.

77.     Defendants Officer Shields, Neven, Piccinini, Currier and Flanigan failed to communicate to Florence McClure Women's Correctional Center staff that Morgan was at risk of committing suicide and failed to sufficiently instruct staff and/or officers to supervise Morgan under adequate suicide prevention policies and protocols.

78.     Upon information and belief, Defendant Tynning knew or should have known that Morgan was at a high risk of committing suicide and failed to adequately supervise Morgan while she was in custody by leaving her alone in her cell and by providing her access to materials that allowed her to commit suicide.

79.     The Defendants made an intentional decision to place Morgan in a cell unsupervised and/or with sheets and/or blankets while they knew or should have known that Morgan was suicidal.

80.     Those conditions put Morgan not only at a substantial risk of suffering serious harm, but Morgan did in fact suffer serious harm.

81.     The Defendants did not take reasonable available measures to abate the risk, including but not limited to: advising staff members/officers that Morgan was suicidal, removing all materials from Morgan's cell that could be used to harm herself, additional supervision, more frequent supervision, placing Morgan in the infirmary, placing Morgan with a cellmate and/or any other suicidal prevention protocols that were utilized or should have been utilized by the Florence facility.  A reasonable officer in the circumstances would have appreciated the high degree of risk involved making the consequence of the Defendants' conduct more obvious.

82.     By the Defendants not taking such measures, the defendants were deliberately indifferent causing Morgan's death.

83.    Further, the Nursing Defendants failed to communicate pertinent patient health care information, failed to follow and implement established policies set forth to identify patient healthcare needs and risks, failed to supervise and train staff, failed to provide access to timely emergency care, failed to provide and have necessary emergency equipment available, failed to properly initiate and apply CPR compressions and failed to properly use the automatic external defibrillator, and otherwise failed to protect Morgan, in that no suicide risk assessment nor associated precautions were completed.

84.    In addition, NDOC staff failed to provide access to timely emergency care as the responding fire department was delayed into and out of the facility to treat and transport Morgan.

85.    The Eighth Amendment of the United States Constitution entitles prisoners to medical care and a prison official violates the Amendment when he or she acts with deliberate indifference to an inmates' serious medical needs.

86.    After Morgan was found hanging in her cell, Defendants Tynning, Currier and the Nursing Defendants were deliberately indifferent to Morgan's serious medical needs by delaying and/or denying her treatment for her injuries caused by the Defendants' prior deliberate indifference to Morgan in allowing Morgan to commit suicide.

87.    Morgan's medical needs were serious.  The failure to treat Morgan's medical needs caused her unnecessary and wanton infliction of pain and ultimately death.

88.    Even though Morgan was dying, and Defendant Tynning and Nursing Defendants had actual knowledge of her worsening condition, Defendant Tynning and the NDOC nursing staff refused to either provide or seek timely medical care thereby disregarding an excessive risk to Morgan's health.

89.    As a direct and proximate result of the aforementioned unlawful and deliberately indifferent conduct by Defendants committed under the color of law and under each individual's authority as employees of the Nevada Department of Corrections, Morgan was deprived of her right to be free from deliberate indifference to her serious medical needs in violation of the Eighth Amendment to the United States Constitution.

90.     As a direct and proximate result of the unlawful conduct of the Defendants, Morgan suffered injuries and damages, including death, excruciating pain, and extreme mental and emotional injuries.  Further, the Plaintiff Estate suffered damages and are entitled to compensation for loss of enjoyment of life, mental, physical and emotional pain and suffering, and other related costs and which with reasonable probability will be experienced and/or required in the future, including but not limited to attorneys' fees and costs and pre- and post-judgment interest, in excess of Seventy-Five Thousand Dollars ($75,000.00).

91.     The wrong and unlawful acts perpetrated by Defendants, in intentionally disregarding the constitutional rights of Morgan were willful, oppressive, malicious, and with wanton disregard for the established rights of the Morgan, thereby justifying the awarding of punitive damages in an amount to be determined at time of trial.

## SECOND CAUSE OF ACTION

### LOSS OF FAMILIAL ASSOCIATION

### 42 U.S.C. § 1983 - FOURTEENTH AMENDMENT—SUBSTANTIVE DUE PROCESS

### PLAINTIFF LACKEY AGAINST ALL DEFENDANTS EXCEPT DEFENDANT NDOC

92.     Plaintiff Lackey re-alleges and incorporates the allegations set forth above as though fully alleged herein.

93.     Morgan was the daughter of Plaintiff Lackey.

94.      Plaintiff Lackey has a liberty interest in her companionship with her child.

95.     As a result of the Defendants having time to deliberate before failing to act in either protecting Morgan from committing suicide and/or failing to provide medical care in a timely manner, their actions shocked the conscience when they were deliberately indifferent. As a direct and proximate result of the unlawful conduct of the Defendants,

96.      The wrong and unlawful acts perpetrated by the Defendants, in intentionally disregarding the constitutional rights of Plaintiff Lackey was willful, oppressive, malicious, and with wanton disregard for the established rights of the Plaintiff Lackey thereby justifying the awarding of punitive damages in an amount to be determined at time of trial.

Plaintiff Lackey suffered damages and is entitled to compensation for loss of enjoyment of life, mental, physical and emotional pain and suffering, and other related costs and which with reasonable probability will be experienced and/or required in the future, including but not limited to attorneys' fees and costs and pre- and post-judgment interest, in excess of Seventy-Five Thousand Dollars ($75,000.00).

97.     The wrong and unlawful acts perpetrated by the Defendants, in intentionally disregarding the constitutional rights of Plaintiff Lackey was willful, oppressive, malicious, and with wanton disregard for the established rights of the Plaintiff Lackey thereby justifying the awarding of punitive damages in an amount to be determined at time of trial.

**THIRD CAUSE OF ACTION**

**NEGLIGENCE**

**AGAINST ALL DEFENDANTS**

98.     Plaintiffs re-allege and incorporate the allegations set forth above as though fully set forth herein.

99.     Defendants had a duty to prevent foreseeable risks of harm, such as the risk that Morgan would inflict self-harm or commit suicide. Defendants knew or should have known that Morgan had a high risk of committing suicide because of her previous failed attempts to commit suicide while in custody and because Morgan's mother provided notice of Morgan's propensity to commit suicide to Defendants. Defendants breached the duty of care by failing to adequately communicate that Morgan was at high risk of committing suicide and/or to instruct Florence McClure Women's Correctional Center staff to implement and follow adequate suicide prevention policies and protocols and/or by failing to adequately monitor Morgan's actions after being informed or otherwise learning that Morgan was suicidal.  Defendants failed to implement adequate protocols or training and/or failed to follow their existing protocols.  Defendants failed to keep Morgan under constant surveillance.  Defendants allowed a known suicide risk inmate to be alone in a cell with a bed sheet.

100.     Further, Nursing Defendants breached the duty of care by failing to communicate pertinent patient health care information, failing to follow and implement established policies set forth to identify patient healthcare needs and risks, failing to supervise and train staff, failed to provide access to timely emergency care, failing to provide and have necessary emergency equipment available, and failing to protect Morgan, in that no suicide risk assessment nor associated precautions were completed.

101.     Defendants' breach caused Morgan to commit suicide resulting in her death.

102.     As the direct and proximate result of Defendant's acts and/or omissions, Plaintiffs suffered general and special damages in excess of seventy-five thousand dollars ($75,000.00).

103.     As a direct and proximate result of Defendants' acts and/or omissions, Plaintiffs have been required to retain the services of an attorney to prosecute this claim and is entitled to be compensated for any costs incurred in the prosecution of this action, including without limitation, any and all costs and attorney's fees.

**FOURTH CAUSE OF ACTION**

**WRONGFUL DEATH**

**AGAINST ALL DEFENDANTS**

104.     Plaintiffs re-allege and incorporate the allegations set forth above as though fully set forth herein.

105.     Defendants had a duty to prevent foreseeable harm and to provide reasonable care in monitoring and supervising Morgan.

106.     Defendants breached their duties when they failed to exercise that degree of care alleged herein, and specifically failed in those duties as alleged herein.

107.     As a direct and proximate result of Defendants' negligence, Morgan experienced great pain and suffering and ultimately died as a further result of Defendants' negligence.

108.     As a direct and proximate result of Defendants' actions or omissions described above, Morgan suffered fatal injuries and died for which her heirs are entitled to recovery allowed and set forth in NRS 41.085, including all applicable statutes.

109.     As a direct and proximate result of Defendants' negligence, Plaintiffs incurred medical expenses and burial expenses; the full nature and extent of said expenses are not known to Plaintiffs and leave is requested to amend this complaint to conform to proof at time of trial.

110.     As a direct and proximate result of Defendants' acts and/or omissions, Plaintiffs have been required to retain the services of an attorney to prosecute this claim and is entitled to be compensated for any costs incurred in the prosecution of this action, including without limitation, any and all costs and attorney's fees.

**FIFTH CAUSE OF ACTION**

**GROSS NEGLIGENCE**

**AGAINST ALL DEFENDANTS**

111.     Plaintiffs re-allege and incorporate the allegations set forth above as though fully set forth herein.

112.     Defendants owed Morgan a duty to use the care and skill ordinarily exercised in the operation of like facilities to observe, screen, report, monitor, and provide reasonable security regarding Morgan's condition.

113.     Defendants acted with gross indifference and/or with a conscious disregard for the safety and life of Morgan at all times while Morgan was in custody on or about April 28, 2018, and as a direct and proximate result of Defendants' gross negligence, Morgan ultimately died.

114.     As a direct and proximate result of the conduct of Defendants describe hereinabove, Plaintiffs have sustained damages in excess of seventy -five thousand dollars ($75,000.00)

115.     Defendants' actions were willful, oppressive, and malicious, thereby justifying punitive and exemplary damages in an amount to be determined at trial.

116.     As a direct and proximate result of Defendants' acts and/or omissions, Plaintiffs have been required to retain the services of an attorney to prosecute this claim and is entitled to be compensated for any costs incurred in the prosecution of this action, including without limitation, any and all costs and attorney's fees.

## SIXTH CAUSE OF ACTION

### NEGLECT OF VULNERABLE PERSON

### AGAINST ALL DEFENDANTS

117.     Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

118.     NRS 41.1395 provides for damages for injuries suffered by vulnerable persons as a result of abuse or neglect.

119.     Vulnerable person includes a person who has a physical or mental impairment that substantially limits one or more of the major life activities and/or has a medical or psychological record of the impairment.

120.     Morgan is in the class of persons NRS 41.1395 was designed to protect.

121.     Defendants violated NRS 41.1395 by injury to Morgan by way of neglect, as prohibited and defined by NRS 41.1395.

122.     As a direct and proximate result of the neglect defined by NRS 41.1395, Plaintiffs are entitled to an award which is two (2) times the actual damages set forth by NRS 41.1395.

123.     As a direct and proximate result of the negligence as defined by NRS 41.1395, the Plaintiffs are entitled to an award of attorney's fees and costs, as set forth and defined by NRS 41.1395.

## SEVENTH CAUSE OF ACTION

### NEGLIGENT HIRING, TRAINING, SUPERVISION AGAINST
### DEFENDANTS NDOC AND NURSES  FLORES, AND SASTRILLO

124.     Plaintiffs re-allege and incorporate the allegations set forth above as though fully set forth herein.

125.     Defendant NDOC owed a duty as an employer to adequately investigate prior to hiring, to properly train, and adequately supervise their employees, servants, ostensible agents, and/or associates in the performance of their job duties and professional responsibility.

126.     Defendant NDOC knew or should have known of the incompetence, ineptitude, and/or dangerous propensities of its employees, servants, ostensible agents, partners, and/or associates.

127.     Defendant NDOC breached its duty by failing to adequately investigate the backgrounds of, to adequately supervise NDOC employees, servants, ostensible agents, partners and/or associates.

128.     Specifically, Defendant NDOC breached its duty by failing to provide prompt and competent access and delivery of mental health attention and suicide prevention when inmates, such as Morgan, were having a mental health crisis requiring prompt and adequate intervention.

129.     Defendant NDOC additionally breached its duty by:

    a.  Failing to provide appropriate and competent staff to safely monitor and observe like Morgan, who suffers from mental disabilities and/or are at risk of committing suicide and/or self-harm;

    b.  Failing to implement and/or enforce policies and procedures regarding suicide prevention;

c.  Failing to provide access and delivery of mental health and medical care and treatment for inmates with known mental disabilities and/or propensities for self-harm;

d.  Failing to provide adequate housing and properly classifying inmates to ensure access and delivery of mental and/or medical care and suicide prevention;

e.  Failing to provide adequate and reasonable monitoring and housing for inmates that present a risk of suicide to prevent mental health disasters such as suicide attempts; and

f.  Failing to supervise their subordinates and/or staff were implementing and complying with implementing policies and procedures to ensure the reasonable security and safety of inmates.

130.   Nurses Flores, and Sastrillo breached their duties by failing to read, review and implement Medical Directive No. 135, *Receiving Screening*, which requires all inmates to be assessed at Intake to determine their medical needs.   Nurses Flores and Sastrillo admitted to said failures.

131.   Nurses Flores and Sastrillo further breached their duties by failing to properly train the nursing staff on CPR compressions and the use of an automatic external defibrillator.

132.   As a direct and proximate cause of Defendant's negligent hiring, training, and supervision, Plaintiffs suffered general and special damages in excess of seventy-five thousand dollars ($75,000.00).

133.   As a direct and proximate result of Defendant's acts and/or omissions, Plaintiffs have been required to retain the services of an attorney to prosecute this claim and is entitled to be compensated for any costs incurred in the prosecution of this action, including without limitation, any and all costs and attorney's fees.

/ / /

/ / /

/ / /

### EIGHTH CAUSE OF ACTION

**PROFESSIONAL NEGLIGENCE**

**AGAINST DEFENDANT NURSING DEFENDANTS**

134.    Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

135.    Upon Morgan's readmission to Florence McClure Women's Correctional Center, the nursing staff assumed responsibility for Morgan's medical care and had a duty to use such skill, prudence and diligence as other similarly situated nurses in and assessing and providing medical care to Morgan.

136.    Morgan was dependent on the Florence McClure Women's Correctional Center's nursing staff for her medical care.

137.    Despite Florence McClure Women's Correctional Center's nursing staff knowledge of Morgan's dependence on them for medical care, they failed to provide adequate medical to her, as alleged above.

138.    The Nursing Defendants failed to meet the applicable standard of care in their provision of medical to Morgan, including, but not limited to, by: (1) failing to communicate pertinent patient healthcare information; (2) failing to follow and implement established policies set forth to identify patient healthcare needs and risks; (3) failing to supervise and train staff; (4) failing to properly administer CPR compressions and to properly use the automatic external defibrillator; (5) failing to provide and have necessary emergency medical equipment; and (6) failing to protect Morgan, in that no medical or suicide risk assessment was performed upon her return Intake at the facility.

139.    The Nursing Defendants' medical care of Morgan fell below the standard of care and was a proximate caused of her injuries and damages, including by contributing to her death. *See* **Exhibit 1**

140.   Morgan's injuries and death were therefore the result of the Nursing Defendants' negligence.

141.   The damages and injuries directly and proximately caused by the Nursing Defendants' negligence was permanent.

142.   As a direct and proximate result of the Nursing Defendants' negligence and Morgan's death, Lackey and Lopez incurred damages of grief, sorrow, loss of companionship, society, comfort, and consortium, and damages for pain and suffering, and mental anguish.

143.   The damages and injuries directly and proximately caused by the Nursing Defendants' negligence were permanent, including future pain and suffering, loss of companionship, and mental anguish from Morgan's untimely death.

144.   Plaintiffs' past and future damages exceed $75,000.

WHEREFORE, Plaintiffs pray for relief as follows:

1.   For general damages in an amount in excess of $75,000.00;

2.   For special damages in an amount in excess of $75,000.00;

3.   For punitive damages in an amount deemed appropriate to punish Defendants (in their personal capacity for their wrongful and egregious conduct;

4.   For reasonable attorney's fees and costs of suit incurred herein;

5.   For pre-judgment and post-judgment interest on all sums according to law; and

6.   For such other and further relief as this Court deems just and proper.

DATED this 27th day of April, 2021.

**CLARK HILL PLLC**

  /s/ Paola M. Armeni, Esq.
PAOLA M. ARMENI
Nevada Bar No. 8537
JEREMY J. THOMPSON
Nevada Bar No. 12503
CLARK HILL PLLC
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
*Attorneys for Plaintiffs,* Morgan Family

EXHIBIT 1

<u>**AFFIDAVIT OF MERIT BY KIMBERLY M. PEARSON, MHA, MBA, RN, CCHP**</u>

STATE OF NEVADA

COUNTY OF ELKO

1. I am a licensed Registered Nurse in good standing licensed by the State of California. I have practiced as a Registered Nurse continuously for 36 years.  I recently served a three-year term on the Board of Directors with the Academy of Correctional Health Professionals (2018-2021).  I have previously served on the Board for the American Correctional Health Services Association – CA/NV chapter (ACHSA). I have been an Accreditation Surveyor for the National Commission on Correctional Health Care (NCCHC), as well as currently holding certification from the Commission as a Certified Correctional Health Professional (CCHP).

   Based upon my training, education, and experience, I am both knowledgeable and qualified to render an expert opinion regarding the applicable standard of care expected to be met in an adult correctional facility, as well as identify and opine regarding violations or breaches in the standard of care related to healthcare delivery in correctional facilities.

2. I have reviewed the following records / documents regarding Ms. Melody Morgan: Protective Order; Nevada Department of Corrections Investigation Report: Nevada Department of Corrections Medical Directives; Community Hospital Shift Log; Transcript of Interview of Director of Nursing, Leilani Flores; Transcript of Interview of Nursing Supervisor (CNIII) Ma Lita Sastrillo; North Las Vegas Fire Department Records; Jail Video 4/28/18; and the Death Certificate for Ms. Morgan.

3. In review of the documents, it is confirmed and not disputed that Ms. Morgan had escaped from the prison and been out of the facility for approximately eight days.  Upon her capture and return to the prison, no Receiving Screening / Intake Screening was conducted to determine her urgent, emergent, and/or ongoing healthcare needs, including the critical issue of identifying suicide risk.

4. Upon her capture, Ms. Morgan's mother relayed her concern to an Investigator that Ms. Morgan had been suicidal in the past, and she was again concerned about this possibility. The Investigator called a Sergeant at the prison to relay this information.  However, there is no evidence this information was ever provided to healthcare staff in order to evaluate and appropriately manage and treat her reported suicidal history and mental health conditions.

5. Both the Director of Nursing and Nursing Supervisor ███████████████████ ████████████████████████████████████████████ Department Policy #135 *Receiving Screening* which requires all inmates to be assessed at Intake to determine their medical needs.  The Director of Nursing ████████████████████████████

Pearson Affidavit                                                                                                    1



' (Interview Sastrillo, page 5)

6.  Ms. Morgan was housed alone in a cell with no suicide precautions initiated (for example, removal of linens and/or harmful objects; close monitoring, referral for mental health evaluation), and she utilized the bed sheet in her cell to create a noose and hang herself from the top bunk bed in the cell.

7.  The emergency response that followed (reviewed via video) when Ms. Morgan was found to be hanging in her cell further revealed a delay in access to care and insufficient resuscitative efforts.  Officers (with keys to the cell) did not "cut down" Ms. Morgan from the bunk with a cut down tool (or similar tool) and did not initiate CPR (cardiopulmonary resuscitation.)  They waited until the medical team arrived; then opened the cell door; and nursing staff used bandage scissors to cut the sheet and lower Ms. Morgan to the floor in order to initiate resuscitative efforts.  And while CPR compressions and the use of an AED (automatic external defibrillator) were initiated, compressions were at times ineffective, but moreover, there was no appropriate positioning and opening of the airway nor the administration of breaths as required by Basic Life Support algorithms until approximately six (6) minutes into the resuscitative process - in part due to the lack of appropriate and necessary equipment (oxygen mask) and lack of appropriate utilization of the equipment (hook up to oxygen tank).  Ms. Morgan was without oxygenation for well over six minutes based upon the video and delayed entry into the cell.

    Additionally, the North Las Vegas Fire Department record reveals that upon arrival to the prison, they were delayed in obtaining initial access to Ms. Morgan because of being held in the Sally Port upon arrival.   It was also documented that they were again delayed in transporting Ms. Morgan to the hospital because "the ambulance was held in the Sally Port for several minutes while prison personnel traded out personnel and checked the ambulance several times." (NLVFD records, page 2)

8.  It is my opinion that the following failures constitute a violation of the expected standard of care necessary to adequately and appropriately care for Ms. Morgan, as well as prevent her unnecessary death:

    - failure to communicate pertinent patient healthcare information  (mother's report of suicide history and concerns);
    - failures on the part of Intake Nurse Brigado Bayawa, Nursing Supervisor Sastrillo, and Director of Nursing Flores to follow and implement established policies set forth to identify patient healthcare needs and risks (Receiving Screening policy);
    - failure to supervise and train staff (intake nursing staff not following policy nor conducting appropriate Receiving Screenings);
    - failure to provide access to timely emergency care (Fire Department being delayed getting into and out of the facility to treat and transport Ms. Morgan);

- failure to provide and have necessary emergency equipment available; and a
- failure to protect Ms. Morgan, in that no suicide risk assessment nor associated precautions were completed.

9. As reported and confirmed by the medical examiner (Dr. Leonardo Roquero), Ms. Morgan's cause of death was suicide by hanging.

I reserve the right to supplement this opinion in light of additional information.

Further Affiant sayeth not.

KIMBERLY M. PEARSON

IN WITNESS WHEREOF I hereunto set my hand and official seal on this 21 day of April 2021.

State of NV
County of Elko

ERIN BUDAK
NOTARY PUBLIC
STATE OF NEVADA
COUNTY OF ELKO
No. 16-1380-6   MY APPT. EXPIRES JANUARY 26, 2024

Erin Budak

Notary Public
My commission expires on 01/26/2024

Pearson Affidavit

3