1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

BONNIE LOPEZ, individually as sister and Special Administrator for the Estate of MELODY MORGAN, deceased; COLLEEN LACKEY, individually as mother of MELODY MORGAN, deceased,

Plaintiffs,

v.

THE STATE OF NEVADA ex rel. NEVADA DEPARTMENT OF CORRECTIONS, WARDEN DWIGHT NEVEN, individually; GARY PICCININI, ASSISTANT WARDEN, individually; BRYAN SHIELDS, individually; OFFICER JOEL TYNNING, individually; OFFICER KARISSA CURRIER; OFFICER JAZMINA FLANIGAN; NURSE JANE BALAO; NURSE BRIGIDO BAYAWA; NURSE LEILANI FLORES; NURSE ROSEMARY MCCRARY; NURSE MA LITA SASTRILLO; NURSE CHRIS SHIELDS; DOES I through X; and ROE ENTITIES I through X, inclusive,

Defendants.

Case No. 2:21-cv-01161-ART-NJK

ORDER

19

20

21

22

23

24

25

26

27

28

This case arises out of the tragic death of Melody Morgan ("Morgan"), who died by suicide on April 28, 2018, after hanging herself at Florence McClure Women's Correctional Center ("Florence McClure"). Plaintiff Bonnie Lopez ("Lopez") is the special administrator for Morgan's estate and is also Morgan's sister. Plaintiff Colleen Lackey ("Lackey") is Morgan and Lopez's mother. She brings this action in her own capacity as the mother and as an heir to the decedent. Plaintiffs' First Amended Complaint ("FAC") alleges the following causes of action: (1) 42 U.S.C. § 1983 (Eighth Amendment – Deliberate Indifference to Serious Medical Need); (2) 42 U.S.C. § 1983 (Fourteenth Amendment – Loss of Familial Association); (3) Negligence; (4) Wrongful Death; (5) Gross Negligence; (6)

1

Neglect of Vulnerable Person; (7) Negligent Hiring, Training and Supervision; and (8) Professional Negligence. (ECF No. 1-2.)

Before the Court is Nurse Defendants Leilani Flores, Ma Lita Sastrillo, and Brigido Bayawa's Motion for Summary Judgment (ECF No. 84).[1]

## I.      BACKGROUND

Plaintiffs allege the following. Decedent Melody Morgan was diagnosed with bipolar disorder, schizophrenia, and multiple personality disorder, and she had approximately three psychiatric hospitalizations. (ECF No. 1-2 at ¶ 31.) Morgan also "had a history of suicidal ideations" and had attempted suicide multiple times since age fourteen. (*Id.* at ¶ 32.) In December 2012, Morgan was arrested and detained for various criminal charges. While detained, she was placed on suicide watch for suicidal ideation. On December 21, 2012, she attempted suicide and was placed on suicide watch. (*Id.* at ¶¶ 33-34.)

In 2013, Morgan pled guilty to a felony and was incarcerated at Florence McClure in Las Vegas, Nevada. (*Id.* at ¶ 36.) Upon admittance at Florence McClure, Morgan's Presentence Investigation Report, Nevada Department of Corrections Transport Form, and other intake forms identified her mental health issues and suicidal ideations. (ECF No. 117-1 at 2; ECF No. 117-2 at 2-4.) Subsequent evaluations at Florence McClure further documented these mental disorders and suicidal tendencies. (ECF No. 117-3 at 70:23-71:01.) Morgan was later transferred to the Jean Conservation Camp, a minimum-custody camp in Nevada for female offenders. (ECF No. 1-2 at ¶ 38.) On April 19, 2018, Morgan and another incarcerated individual escaped from the Jean Conservation Camp. (*Id.* at ¶ 39.) Law enforcement apprehended Morgan on April 26, 2018, after her mother, Lackey, reported her location. (*Id.* at ¶¶ 44–45.) Before law enforcement apprehended Morgan, Lackey told Defendant Inspector Bryan Shields that

---

[1] This Order focuses on the claims related to the failure to provide a full intake. A separate order will address the claims related to the care following Morgan's suicide.

Morgan had a history of mental illness and suicide attempts and requested officials put Morgan on suicide watch because of the risk she would hurt herself if re-captured, especially if she discovered her mother's role in her reincarceration. (*Id.* at ¶¶ 40–42.; ECF No. 118-6 at 37:18-38:15; ECF No. 118-3 at 144:19-145:18.) Inspector Shields relayed Lackey's concern to Defendant Lieutenant Karissa Currier at Florence McClure. (ECF No. 1-2 at ¶ 13; ¶ 48.)

Lieutenant Currier and Officer Flanigan dispute what happened after this phone call. According to Lieutenant Currier, on April 26, 2018, she called Officer Flanigan to convey Lackey's concerns to medical staff and have Morgan placed on suicide watch. (ECF No. 118-8 at 37:20-39:10.) Lieutenant Currier claims that she ordered Officer Flanigan to inform the medical staff at Florence McClure of Lackey's concern, but Officer Flanigan denies that Lieutenant Currier gave her that command. (ECF No. 1-2 at ¶ 14; ¶¶ 49–50.) Officer Flanigan testified that if she had received such a call, she would have written it down in her notes, added the information to a shift log entry on her computer, asked follow up questions, and notified medical staff. (ECF No. 118-9 at 38:13-39:25.) Officer Flanigan stated that she checked her personal notes and shift log and neither documented the April 26 call; however, she did not keep her personal notes. (ECF No. 115-9 at 43:01-43:25.) Lieutenant Currier did not document the call in a shift log either, although she stated in her deposition that shift command does not do shift logs. (ECF No. 115-8 at 47:12-47:15.)

Following Morgan's apprehension, law enforcement took Morgan to Florence McClure on April 26, 2018. (ECF No. 1-2 at ¶ 51.) Morgan was informed that her mother had assisted in locating her. (*Id.* at ¶ 46.) Morgan was housed alone in a cell without any suicide precautions. (*Id.* at 25.) The Florence McClure medical staff neither received any messages regarding Lackey's concerns nor conducted a psychological or psychiatric evaluation of Morgan. (*Id.* at ¶ 56.) Nurse Bayawa claims that if medical staff had received information concerning

Morgan's high suicide risk, then Morgan may have been placed in a suicide room, which is a stripped cell with a camera, suicide blanket, and check ins every 15 minutes. (ECF No. 115-11 at 60:23-62:22.) Two days later, on April 28, 2018, Morgan hanged herself in her cell at Florence McClure. (ECF No. 1-2 at ¶ 56; 58.)

Multiple regulations establish screening requirements for inmates. Administrative Regulation (AR) 643 requires a Registered Nurse to conduct a preliminary medical and mental health assessment within twenty-four hours of their initial intake. AR 643.02(3). AR 645 states that [n]ew admissions to the Nevada Department of Corrections (NDOC) will receive a mental health screening to include a mental health history, suicide potential, evidence of serious mental illness, or acute mental health urgency." (ECF No. 111-5 at 2.) Similarly, Florence McClure Medical Directive 135 requires a registered nurse or licensed practical nurse to "immediately assess inmates" and complete DOC 2510 Intake Screening Form which asks about visual observations of the inmate, their mental status, inmate health history and current status, specific concerns, current prescriptions, placement recommendations, necessary referrals, and PPD results. (ECF No. 111-6 at 2-3.) Doc 2510 specifically asks about inmates' past history of mental health treatment, history of suicide attempts or self-mutilation, current thoughts of suicide, suicide prevention plans, and whether the inmate feels unsafe until seen by a mental health practitioner. (*Id.* at 5.) Florence McClure Medical Directive 319 establishes suicide prevention and response procedures and states "[i]nmates in the Intake/Reception Centers should be initially screened upon arrival by a nurse and a mental health professional, and later clinically interviewed for suicide potential by institutional psychologists and/or psychiatrists prior to their initial intake classification procedures." (ECF No. 111 at 2.)

Despite these regulations, no one administered DOC 2510 during intake. Nurse Bayawa, who was in charge of the intake, admitted he did not complete

DOC 2510 with Morgan when she was admitted on April 26, 2018, and no one conducted the interview with Morgan prior to her suicide. (ECF Nos. 109-11 at 5:24-5:27; 109-12 at 108:08-108:14) Nurse Bayawa further testified that he thought Morgan "was never a mental health problem" because "she qualified for Jean camp which is a mental health 1-1" but that he never looked at Morgan's chart that day because he had been told it was still at Jean Conservation Camp (JCC) at the time. (ECF No. 109-12 at 36:08-36:11, 48:03-48:11.)

Nurse Sastrillo was acting Director of Nursing Services during Morgan's reincarceration.[2] The correctional nurse in charge of inmate intake reported directly to the DONS. (ECF No. 109-13 at 28:17-28:20.) On April 26, 2018, Nurse Bayawa informed Nurse Sastrillo that a previously escaped inmate (Morgan) was returning to Florence McClure. (*Id.* at 33:07-33:18.) Nurse Sastrillo failed to supervise medical staff to ensure they completed DOC 2510 per Medical Directive 135, and NDOC issued her a written reprimand for neglect of duty. (ECF No. 111-8 at 2.) The written reprimand also stated that had Nurse Sastrillo properly supervised the medical staff, they would have completed DOC 2510, which could have prevented her suicide. (*Id.*) Nurse Sastrillo admitted that she was "complacent" in supervising the medical staff regarding the intake process and that the intake on April 26 did not comport with Medical Directive 135 or AR 643. (ECF Nos. 109-13 at 65:09-66:04;111-4 at Response Nos. 6; 21.)

Nurse Flores was the DONS when Morgan returned to Florence McClure. She was responsible for, among other things, overseeing mental health care at Florence McClure. (ECF No. 111-3 at 51:14-51:18.) Plaintiffs state in their Response to the Motion for Summary Judgment that although Nurse Flores was out of town on April 26, 2018, she was still responsible for ensuring medical staff complied with the applicable regulations. (ECF No. 109 at 8.) They also declare

---

[2] Even though Nurse Sastrillo was unsure if she was acting DONS at the time, she stated that she is acting DONS whenever Director Flores was on vacation, and Nurse Flores was out of town April 26, 2018. (ECF No. 109-13 at 40:02-40:07.)

that NDOC investigated Flores for systemic failures surrounding Morgan's failed intake and issued her a letter of reprimand for neglect of duty. (*Id.* at 9.) Nurse Flores testified that she had believed an inmate returning to an NDOC facility after having been outside of one for less than 90 days did not require a full intake but that she never conveyed that belief to the medical staff. (ECF No. 111-3 at 93:04-93:14.) She admits that, after reviewing the administrative regulations, she realized that they should have done an intake. (*Id.* at 93:15-93:23.) Nurse Flores further admits that, despite reviewing Morgan's chart on April 27, 2018, and reviewing notes stating Morgan had previous mental health issues, she took no steps to ensure nurses conducted an intake with Morgan. (*Id.* at 70:14-71:05.) She stated that she believed it was her fault that the intake process was incorrect. (*Id.* at 97:15-97:18.)

### III.   LEGAL STANDARD

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting or disputing a fact "must support the assertion by … citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is a sufficient evidentiary basis on which a reasonable fact-finder could rely to find for the nonmoving party. *Id.*

In determining summary judgment, courts apply a burden-shifting analysis. A party seeking summary judgment bears the initial burden of

demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the nonmovant bears the burden at trial, as is the case here, the movant can meet its burden by either (1) presenting evidence to negate an essential element of the nonparty's case; or (2) by demonstrating that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case. See *id.* at 323-24. After the movant has met its burden, the burden shifts to the nonmovant to come forward with specific facts showing a genuine issue of material fact remains for trial. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although "[o]n summary judgment the inferences to be drawn from the underlying facts...must be viewed in the light most favorable to the party opposing the motion," *id.* (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)), the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586-87 (internal citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. 242 at 252. In other words, the non-moving party cannot avoid summary judgment by "relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citing *Angel v. Seattle-First nat. Bank*, 653 F.2d 1293, 1299 (9th Cir. 1981)). Instead, to survive summary judgment, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing admissible evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. 317 at 324.

If the moving party presents evidence that would call for judgment as a matter of law at trial if left uncontroverted, then the respondent must show by specific facts the existence of a genuine issue for trial. *Anderson*, 477 U.S. 242 at 250. "If, as to any given material fact, evidence produced by the moving party... conflicts with evidence produced by the nonmoving party . . . we must assume

the truth of the evidence set forth by the nonmoving party with respect to that material fact." *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013). If reasonable minds could differ on material facts, summary judgment is inappropriate because summary judgment's purpose is to avoid unnecessary trials only when the material facts are undisputed; if not, the case must proceed to the trier of fact. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995) (citing *Lindahl v. Air France*, 930 F.2d 1434, 1436 (9th Cir. 1991)).

## IV. ANALYSIS

### A. EIGHTH AMENDMENT CLAIMS

The Court must determine whether the Nurse Defendants potentially violated the Eighth Amendment. Prison officials violate the Eighth Amendment's cruel and unusual punishments clause when they are "deliberately indifferent" to a prisoner's "serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 102–05 (1976). Such a violation "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988) (citing *Estelle*, 429 U.S. at 105); *see also Stewart v. Aranas*, 32 F.4th 1192, 1195 (9th Cir. 2022) (requiring a prisoner to demonstrate that any alleged delay in medical care led to further injury).

A claim for deliberate indifference to serious medical need can be asserted by a pretrial detainee or a prisoner. *Horton by Horton v. City of Santa Maria,* 915 F.3d 592, 599 (9th Cir. 2019) (discussing standards for deliberate indifference). A pretrial detainee's claim deliberate indifference is brought as a Due Process violation under the Fourteenth Amendment, while a prisoner's similar claim is a violation of the Eighth Amendment. *Id.* As explained in *Horton,* while the elements of both claims are the same, they differ in the required showing of deliberate indifference. *Id.* at 602. To demonstrate deliberate indifference, the plaintiff must show two things: (1) "a serious medical need by demonstrating that failure to

treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain"; and (2) "the defendant's response to the need was deliberately indifferent." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations and quotations omitted).

The Ninth Circuit differentiated these claims in *Gordon* in 2018 when it held that a pretrial detainee's Fourteenth Amendment claim for deliberate indifference is analyzed under a "purely objective standard." *Horton*, 915 F.3d at 602 (citing *Gordon v. County of Orange*, 888 F.3d 1118, 1125-26 (9th Cir. 2018)). Under *Gordon*, to prove deliberate indifference a pretrial detainee must show that there was "a substantial risk of serious harm to the plaintiff that could have been eliminated through reasonable and available measures that the officer did not take, thus causing injury that the plaintiff suffered." *Id.* (quoting standard from *Castro*, 833 F.3d at 1068-71, that was adopted in *Gordon*, 888 F.3d at 1125-26). In contrast, a prisoner's claim for deliberate indifference under the Eighth Amendment is analyzed under a partially *subjective* standard that requires a plaintiff to show "an objective risk of harm and a subjective awareness of that harm." *Id.* at 600*, citing Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cir. 2010), vacated, 563 U.S. 915 (2011), opinion reinstated in relevant part, 658 F.3d 897 (9th Cir. 2011) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

Because the serious medical need here involved risk of suicide, the Ninth Circuit's holdings in *Conn* and *Clouthier v. County of Contra Costa,* 591 F.3d 1232, 1241-43 (9th Cir. 2010) are particularly relevant. *See Conn*, 591 F.3d at 1105 (reversing summary judgment in favor of officers who failed to report risk of detainee's suicide attempt and threats); *Clouthier*, 591 F.3d at 1254 (reversing summary judgment in favor of mental health worker who removed suicide prevention measures). Although *Conn* and *Clouthier* each concerned pretrial detainees, both cases were decided before *Gordon,* so the court analyzed the claims under the then-current Eighth Amendment test. *Horton,* 915 F.3d 592

(citing *Conn*, 591 F.3d at 1095)). To show deliberate indifference in *Conn,* the plaintiff was required to show "an objective risk of harm and a subjective awareness of that harm*." Horton,* 915 F.3d 592 (citing *Conn*, 591 F.3d at 1095)). Because Morgan was a prisoner, the claims here are governed by the Eighth Amendment standard, which is the same standard applied in *Conn* and *Clouthier*.

### 1. SERIOUS MEDICAL NEED

Plaintiffs have demonstrated "a serious medical need." The Ninth Circuit has held that "[a] heightened suicide risk or an attempted suicide is a serious medical need." *Conn*, 591 F.3d at 1095 (citing, inter alia, *Doty v. County of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994)). "The requirements for mental health care are the same as those for physical health care needs."). *Doty* 37 F.3d at 546. While *Conn* involved Fourteenth Amendment Due Process claims brought on behalf of a pretrial detainee, the "serious medical need" analysis is the same for prisoner Eighth Amendment claims. *Id.* Here, Defendants agree that a manifest suicide risk is a serious medical need. (ECF No. 84 at 19.)

The Court is not persuaded by Defendants' argument the that the fact Morgan did not commit suicide until April 28 shows she was not suicidal on April 26, and thus Morgan did not have a serious medical need. (ECF No. 128 at 7-8.) Lackey informed Inspector Shields that Morgan had hurt herself and attempted suicide in the past and would do so again if she was re-incarcerated, especially given her mother's role in locating her. (ECF No. 1-2 at ¶¶ 40-42; ¶ 47.) Thus, the Court finds Plaintiffs' circumstances "satisf[y] the objective component of a serious medical need." *Kamakeeaina v. City & Cty. of Honolulu*, No. CIV. 11-00770 JMS, 2014 WL 1691611, at *7 (D. Haw. Apr. 29, 2014), aff'd sub nom. *Kamakeeaina v. Maalo*, 680 F. App'x 631 (9th Cir. 2017) (finding statements made by plaintiff to the defendants that plaintiff was "ready to commit suicide" were sufficient to show a serious medical need).

///

## 2. INDIFFERENCE TO THAT NEED

To prove deliberate indifference under the Eighth Amendment, Plaintiffs must meet a "'subjective deliberate indifference' standard." *Sandoval v. County of San Diego*, 985 F.3d 657, 667 (9th Cir. 2021) (internal citations omitted). This requires Plaintiffs to show that Defendants were "(a) *subjectively aware* of the serious medical need and (b) failed to adequately respond." *Conn*, 591 F.3d 1081 at 1096 (internal citations omitted) (emphasis in original). To fulfill the subjective requirement for deliberate indifference, Plaintiffs "must demonstrate that the risk was obvious or provide other circumstantial or direct evidence that the prison officials were aware of the substantial risk to [the defendants'] safety. *Lemire*, 726 F.3d at 1078 (citing *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010)). "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* (quoting *Farmer*, 511 U.S. at 842). Plaintiffs must also show "that there was no reasonable justification for exposing the inmates to the risk." *Id.* (citing *Thomas*, 611 F.3d at 1150). "A prison official's justification for exposing inmates to a substantial risk of harm is reasonable only if it represents a proportionate response to the penological circumstances in light of the severity of the risk to which the inmates are exposed." *Id.* at 1079 (citing *Thomas*, 611 F.3d at 154-55).

Supervisors can be held liable under § 1983 through culpable action or inaction. The Ninth Cicruit has recognized that "the supervisor need not be 'directly and personally involved in the same way as are the individual officers who are on the scene inflicting the constitutional injury.'" *Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011) (quoting *Larez v. City of Los Angeles*, 946 F.2d 630, 645 (9th Cir. 1991)). "Rather, the supervisor's participation could include his 'own culpable action or inaction in the training, supervision, or control of his subordinates,' 'his acquiescence in the constitutional deprivations of which the complaint is made,' or 'conduct that showed a reckless or callous indifference to

the rights of others.'" *Id.* (quoting *Larez*, 946 F.2d at 646).

Turning to Nurse Bayawa, the issue is whether he failed to adequately respond to Morgan's known risk of suicide. Nurse Bayawa was responsible for conducting Morgan's intake. (ECF No. 109-12 at 33:11-33:24.) He admitted that, despite regulations, he never completed DOC 2510 with Morgan and nor reviewed her chart at intake. (*Id.* at 48:03-48:11; 53:07-53:24; 108:8-108:14.) He instead assumed Morgan "was never a mental health problem" because "she qualified for Jean camp which is a mental health 1-1." (*Id.* at 36:08-36:11.)

The Court finds Plaintiffs' allegations sufficient to raise a genuine issue of material fact as to whether Nurse Bayawa failed to adequately respond to Morgan's known risk of suicide. Plaintiff's expert, Nurse Kimberly Pearson, found that "[f]ailing to assess for suicidality at Intake is a gross violation of the standard of care and evidence of disregard for Ms. Morgan's well-being." (ECF No. 111-10 at 14.) A reasonable jury could conclude that not conducting a mental health assessment, in violation of regulations, constitutes deliberate indifference.

A reasonable jury could similarly find that Nurses Flores and Sastrillo were deliberately indifferent to Morgan's serious medical needs. A supervisor can be held liable under the Eighth Amendment for "his 'own culpable action or inaction in the training, supervision, or control of his subordinates.'" *Starr*, 652 F.3d at 1205 (quoting *Larez,* 946 F.2d at 646). Here, Nurse Flores was the DONS, and Nurse Sastrillo was the acting DONS on April 26, 2018, the day Morgan was returned to Florence McClure. (ECF No. 109-13 at 40:02-40:07.) The DONS is responsible for overseeing the nurse who conducts inmate intake. (*Id.* at 28:17-28:20.) Nurse Sastrillo admitted that she was "complacent" in supervising the intake process and that Nurse Bayawa's failure to conduct a mental health assessment did not comport with Medical Directive 135 or AR 643. (ECF Nos. 109-13 at 65:09-66:04; 111-4 at Response Nos. 6; 21.) Nurse Flores testified that she had originally believed an inmate returning to an NDOC facility after having

12

been outside of one for less than 90 days did not require a full intake but that she never conveyed that belief to the medical staff. (ECF No. 111-3 at 93:04-93:14.) She admits that, after reviewing the administrative regulations, she realized that they should have done an intake. (*Id.* at 93:15-93:23.) Nurse Flores further admits that she never took any steps to ensure a nurse conducted a mental health assessment for Morgan even after reviewing Morgan's chart on April 27, 2018, and reading notes stating Morgan had previous mental health issues. (*Id.* at 70:14-71:05.) Nurse Flores stated that she believed it was her fault that the intake process did not adhere to proper procedures. (*Id.* at 97:15-97:18.) Thus, the facts present, at minimum, a genuine dispute over whether Nurses Flores and Sastrillo were deliberately indifferent to Morgan's heightened suicide risk.

Defendants' argument that they had no knowledge of Morgan's heightened suicide risk misconstrues the deliberate indifference analysis. The proper inquiry is whether Defendants knew the failure to conduct a mental health assessment "would pose a substantial risk of serious harm to someone in [Morgan's] situation, not simply whether they were subjectively aware of [Morgan's] specific medical needs." *Lemire v. Cal. Dep't of Corr. & Rehab*, 726 F.3d 1062, 1078-79 (9th Cir. 2013) (citing *Gibson v. Cty. of Washoe*, 290 F.3d 1175, 1191 (9th Cir. 2002), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016)). The Court finds Defendants' argument unpersuasive because these regulations were designed to protect individuals at risk of suicide. The failure to conduct a mental health assessment in order to identify inmates at a heightened risk of suicide and provide them necessary treatment could lead to many people like Morgan to kill themselves. And the fact that Morgan had just been transferred from JCC may have indicated potential mental health needs, even if the nurses were unaware of her escape and capture. In addition, Nurse Flores testified that she looked at Morgan's file on April 27, 2018, the day before

Morgan committed suicide, and read notes from the mental health team about her prior mental health issues. (ECF No. 111-3 at 70:14-71:05.) A reasonable jury could find these facts sufficient to demonstrate the Nurse Defendants' knowledge of Morgan's heightened suicide risk.

Defendants also argue that they were not deliberately indifferent because they were unaware that NDOC policy required a nurse to immediately conduct a full intake and thus could not have known failure to complete the mental health assessment posed a knowing, substantial risk to Morgan's safety. (ECF No. 84 at 20.) However, a reasonable jury could find that not conducting mental health assessments on returning inmates, even if they were not gone long, was such an obvious risk that they could infer subjective awareness. Defendants also claim their confusion over the intake policy provides a justification to exposing Morgan to the substantial risk of suicide. (*Id.*) But such a justification is only reasonable "if it represents a proportionate response to the penological circumstances in light of the severity of the risk to which the inmates are exposed." *Lemire*, 726 F.3d at 1079 (citing *Thomas*, 611 F.3d a 1154-55). A reasonable jury could find that the nurses' ignorance of current suicide prevention policies and requirements was not proportional to the ultimate risk of inmates losing their lives.

### 3. CAUSATION

The Court next considers whether the alleged deliberate indifference was both an actual and a proximate cause of Plaintiffs' harm. *Castro*, 797 F.3d at 667 (citing *Lemire*, 726 F.3d at 1074). This causation analysis applies to both Eighth and Fourteenth Amendment claims. *See Gordon,* 888 F.3d at 1125 (describing the requirements for a pretrial detainee's Fourteenth Amendment medical care claim, including a causation requirement); *Lemire*, 726 F.3d at 1074 (citing *Conn*, 591 F.3d at 1098-01) (explaining that Eighth Amendment deliberate indifference claims require a showing of both actual and proximate cause). "[P]laintiffs who have already demonstrated a triable issue of fact as to whether prison officials

exposed them to a substantial risk of harm, and who actually suffered precisely [that foreseeable harm], will also typically be able to demonstrate a triable issue of fact as to causation." *Lemire*, 726 F.3d at 1080-81 (citing *Conn*, 591 F.3d at 1098-1101; *White*, 901 F.2d 1501, 1505 (9th Cir. 1990)). Conduct is an actual cause of injury "only if the injury would not have occurred 'but for' that conduct." *White*, 901 F.2d at 1505 (internal citations omitted). Actual or "but-for" causation is "purely a question of fact." *Robinson v. York*, 566 F.3d 817, 825 (9th Cir. 2009). "Once it is established that the defendant's conduct has in fact been one of the causes of the plaintiff's injury, there remains the question whether the defendant should be legally responsible for the injury"—in other words, whether the defendant's actions were a proximate cause. *White*, 901 F.2d at 1506. While a defendant "'is not the proximate cause of [the plaintiff]'s alleged injuries if another cause intervenes and supersedes their liability for the subsequent events[,] . . . foreseeable intervening causes . . . will not supersede the defendant's responsibility.'" *Conn*, 591 F.3d at 1101 (quoting *White*, 901 F.2d at 1506). "'If reasonable persons could differ' on the question of causation then 'summary judgment is inappropriate and the question should be left to a jury.'" *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1080 (9th Cir. 2013) (quoting *White*, 901 F.2d at 1506).

Here, the question of causation should be left to the jury. *Conn*, 591 F.3d at 1098. As in *Conn,* the Court is "satisfied . . . that [Plaintiffs] presented sufficient evidence of actual and proximate causation to defeat summary judgment and give rise to a jury question whether [the nurse defendants] caused [Morgan's] eventual suicide." *Conn*, 591 F.3d at 1098. Regarding actual cause, construing all the evidence in the light most favorable to Plaintiffs, the Court finds that a reasonable jury could conclude that the prison could have prevented Morgan's suicide if the nurses had conducted a mental health assessment at intake. Even NDOC, in Nurse Sastrillo's letter of reprimand, found that if a nurse had conducted a full

intake, then they could have prevented Morgan's suicide. (ECF No. 111-8 at 2.)

Defendants argue Plaintiffs cannot prove causation because "even if Morgan was suicidal on April 26, 2018 (which Nurse Defendants maintain she was not, evident in the fact that she did not actually commit suicide until two full days later), Plaintiffs cannot prove that Morgan would not have evaded the questions during the intake process and/or denied any suicide risk." (ECF No. 84 at 19.) But this ignores that suicidal people may wait days or even more to commit suicide and the intake nurse may have identified Morgan as suicidal even if she was evasive or uncooperative. If a person could not be suicidal at least two days prior to them attempting suicide, or if mental health professionals could only identify people with suicidal ideations if the person admitted to being suicidal, then that defeats the purpose of such assessments in the first place. *Conn* and *Clouthier* confirm that suicidal ideations can persist for hours, days, and weeks and that mental health assessments, which consider a "variety of variables," can be effective in preventing suicide. *Conn,* 591 F.3d at 1089; *Clouthier,* 591 F.3d at 1237-40.

Morgan evidently displayed signs of being suicidal prior to April 28. Officer Eugene White testified that Morgan spoke with Officer Brennan the day before committing suicide, and Officer Brennan told him Morgan "looked real depressed and was telling her like, I can't do this time." (ECF No. 109-10 at 71:01-71:02.) Thus, Morgan may have expressed her suicidal ideations or a nurse may have inferred such ideations from her behavior if a nurse conducted a proper intake.

Defendants argue that they are not a cause of Morgan's death because they were never informed of Lackey's concerns by Officers Currier or Flanigan. (ECF No. 84 at 34.) But a reasonable jury could find both the Nurse Defendants and Officers Currier and Flanigan independently responsible for Morgan's death. They could conclude that the prison could have prevented Morgan's suicide if officers had properly conveyed Lackey's concerns to medical staff or also if medical staff

had properly conducted a full intake to assess Morgan's risk of suicide.

As for proximate cause, the Court finds that Plaintiff has "presented sufficient evidence of foreseeability that the question of proximate cause must be decided by a jury." *Id.* at 1102. A reasonable jury could conclude that Morgan's suicide was a "foreseeable and normal result" of not conducting a mental health assessment to screen for risk of suicide and other mental health issues. *See White*, 901 F.2d at 1506.

In sum, the Court finds Plaintiffs' allegations sufficient to show genuine issues of material facts as to whether the nurse defendants were deliberately indifferent to Morgan's heightened risk of suicide in violation of the Eighth Amendment.

### B. FOURTEENTH AMENDMENT CLAIMS

The Court turns to Plaintiffs' Fourteenth Amendment claims for impermissible interference with familial association against Nurses Flores, Sastrillo, and Bayawa. "Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct." *Lemire*, 726 F.3d at 1075 (citing *Wilkinson v. Torres*, 610 F.3d 546. 554 (9th Cir. 2010)). Officers violate the Fourteenth Amendment's substantive due process protections when their "conduct 'shocks the conscience.'" *Nicholson v. City of Los Angeles*, 935 F.3d 685, 692-93 (9th Cir. 2019) (quoting *Wilkinson*, 610 F.3d at 554). The proper analysis turns on whether the officer had time to deliberate prior to the conduct at issue. "Where actual deliberation is practical, then an officer's deliberate indifference may suffice to shock the conscience." *Tatum v. Moody*, 768 F.3d 806, 821 (quoting *Wilkinson*, 610 F.3d at 554). In contrast, if "a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.*

The Court finds that summary judgment for the Fourteenth Amendment claim against Nurses Flores, Sastrillo, and Bayawa is inappropriate. As discussed in the Eighth Amendment section, since this Court finds Plaintiffs' allegations sufficient to raise a genuine issue of material fact concerning whether the nurses acted with deliberate indifference, the Court denies their summary judgment motion. *See Lemire*, 726 F.3d at 1075 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 849-50 (1998) ("Just as the deliberate indifference of prison officials to the medical needs of prisoners may support Eighth Amendment liability, such indifference may also 'rise to the conscience-shocking level' required for a substantive due process violation.")

Despite Nurse Defendants arguments to the contrary, they can still be held liable for violating the Fourteenth Amendment even if they lacked any personal knowledge of Morgan's suicide risk. They only needed to know that their actions or inactions "would pose a substantial risk of serious harm to someone in [Morgan's] situation, not simply whether they were subjectively aware of [Morgan's] specific medical needs." *Lemire*, 726 F.3d at 1077-78 (citing *Gibson v. Cty. of Washoe*, 290 F.3d 1175, 1191 (9th Cir. 2002), *overruled on other grounds by Castro v. Cty. of Los Angeles,* 833 F.3d 1060, 1076 (9th Cir. 2016)). Because a reasonable jury could conclude that the nurses were aware that not screening returning inmates for suicide risk could result in inmates committing suicide, the Court finds Defendants' argument unpersuasive.

## C. STATE LAW CLAIMS

### 1. Negligent Hiring, Training, and Supervision Claim

As an initial matter, Plaintiffs conceded Defendants' argument on negligent hiring, training, and supervision. (ECF No. 109 at 30 n.171.) Thus, the Court will dismiss the negligent hiring, training, and supervision claim against Nurses Flores and Sastrillo.

///

### 2. Causation

Because this Court finds that a jury must resolve the question of actual and proximate cause, it would be inappropriate to grant Defendants' requests for summary judgment on the state law claims. In their motions for summary judgment, Defendants argue Plaintiffs cannot prove that their failure to conduct a full intake was the actual or proximate cause of Morgan's death. (ECF No. 84 at 32.) However, as discussed above, a reasonable jury could conclude the nurses' conduct was both an actual and proximate cause of Morgan's death.

### 3. Non-Professional Negligence Claims Against Nurses

Defendants also argue that Plaintiffs' negligence claims against the nurse defendants can only be brought as professional negligence claims, and thus the Court must dismiss Plaintiffs' ordinary negligence, gross negligence, wrongful death, and neglect of a vulnerable person claims. (*Id.* at 43.) Because the Court agrees with the Defendants, the Court will dismiss these claims.

Nevada has specific laws addressing professional negligence. It defines professional negligence as "the failure of a provider of health care, in rendering services, to use the reasonable care, skill, or knowledge ordinarily used under similar circumstances by similarly trained and experienced providers of health care." NRS 41A.015 (2015). "Providers of health care" includes licensed nurses. NRS 41A.017 (2019). Plaintiffs must include a supporting affidavit from a medical expert when making professional negligence claims and failure to meet this requirement will result in the action being dismissed without prejudice. NRS 41A.071 (2022).

Courts are empowered to determine if a claim sounds in ordinary or professional negligence. "If the alleged breach involves 'medical judgment, diagnosis, or treatment,' it is likely a claim for medical malpractice." *Estate of Curtis v. South Las Vegas Medical Investors, LLC.*, 466 P.3d 1263, 1267 (Nev. 2020) (quoting *Szymborski v. Spring Mountain Treatment Center*, 403 P.3d 1280,

1284 (Nev. 2017)). "Thus, 'if the jury can only evaluate the plaintiff's claim after presentation of the standards of care by a medical expert, then it is a [professional negligence] claim.'" *Id.* (quoting *Szymborski*, 403 P.3d at 642). "If, on the other hand, the reasonableness of the healthcare provider's actions can be evaluated by jurors on the basis of their common knowledge and experience, then the claim is likely based in ordinary negligence." *Id.* (citing *Szymborski*, 403 P.3d at 642). Because the distinction between professional and ordinary negligence can be subtle, courts look to the "'gravamen or substantial point or essence'" of each claim to make the necessary determination. *Id.* (quoting *Szymborski*, 403 P.3d at 642-43).

In the narrow set of cases "where the negligence alleged involves a medical diagnosis, judgment, or treatment but the jury is capable of evaluating the reasonableness of the health care provider's actions using common knowledge and experience," the court may not require a medical affidavit. *Id.* at 1267. The exception only applies in "rare situations" where the claim does not raise "questions of medical judgment beyond the realm of common knowledge and experience." *Id.* (quoting *Bryant v. Oakpointe Village Nursing Ctr., Inc.*, 684 N.W. 2d 864, 871 (Mich. 2004)).

Because Plaintiffs concede that their state law claims sound in professional negligence (ECF No. 109 at 42), the question is whether their ordinary negligence-based claims must be dismissed. Plaintiffs argue that "the legal inquiry is not whether other claims become subsumed into a professional negligence claim but whether the <u>affidavit requirement</u> in NRS 41A.071 applies to those claims as well." (ECF No. 109 at 42.) (emphasis in original). Plaintiffs cite as evidence *Schwarts v. Univ. Med. Ctr. of S. Nevada*, 460 P.3d 25 (Nev. 2020) (unpublished)(dismissing plaintiffs' civil conspiracy claim premised on medical malpractice based on failure to file affidavit with the complaint) and *Yafchak v. S. Las Vegas Med. Invs.,* LLC, 138 Nev. Adv. Op. 70, 519 P.3d 37 (2022). Neither

case is helpful. In *Schwarts* the relevant claim was dismissed based on failure to file a required affidavit when proving the civil conspiracy claim necessarily required showing professional negligence. *Schwarts*, 460 P.3d at 25. In *Yafchak* the question was whether the claims sounded in professional negligence. *See*; *Yafchak,* 519 P.3d at 39. The court in *Yafchak* reversed the district court's order dismissal of Yafchak's complaint because it erred "in summarily concluding that LCC met its burden in proving that Yafchak's allegations sounded in professional negligence" and remanded the case for further proceedings to develop the factual record to clarify if the claims sounded in professional negligence or elder abuse. *Yafchak*, 519 P.3d at 39-41.

When, as here, it is undisputed that the claims sound in professional negligence, it appears that ordinary negligence claims must be dismissed. *See Estate of Cronin v. G4 Dental Enterprises, LLC,* 526 P.3d 1111 (Nev. App. 2023). In *Estate of Cronin*, the Nevada Court of Appeals upheld the dismissal of negligence claims that are actually rooted in professional negligence. *See* 526 P.3d at 1111 ("Their judgment at each stage of John's care raises questions beyond what common knowledge and experience provide, so the allegations related to John's treatment arise from medical negligence and were properly dismissed as general negligence claims.") Here Plaintiffs have failed to show why this Court should allow Plaintiffs to proceed on their ordinary negligence claims when they admit the claims sound in professional negligence. As such, the Court will dismiss all of the negligence claims against the nurses except the professional negligence claims.

### 4. Professional Negligence Claim

#### i. Compliance with Statutory Requirements

Plaintiffs complied with the requirements for bringing a professional negligence claim involving a death. To establish liability for personal injury or death against medical professionals, Plaintiffs must include evidence from expert

medical testimony, material from recognized medical texts, treaties, or regulations from the facility where the alleged negligence occurred to show both "the alleged deviation from the accepted standard of care in the specific circumstances of the case and to prove causation of the alleged personal injury or death[.]" NRS 41A.100(1). Defendants allege that Nurse Pearson failed to state that "the Nurse Defendants' alleged deviation from the standard of care **was the proximate cause of Morgan's death**." (ECF No. 84 at 48.) (emphasis in original) They claim Nurse Pearson's testimony did not rise to the necessary "reasonable degree of medical probability" standard for causation. *Morsicato v. Sav-On Drug Stores, Inc.*, 121 Nev. 153, 158 (Nev. 2005).

The Court rejects Defendants' argument because Nurse Pearson's report and affidavit substantiate the claim of causation based on professional negligence by Nurse Defendants. In *Morsicato*, both parties agreed that the doctor's testimony was not made to a reasonable degree of medical probability. *Id.* at 157. The doctor originally testified that an autoimmune response was "the most likely cause of the injury" and later stated, after the court told him that his testimony would be stricken, that "more likely than not an autoimmune response was the most likely cause of the injuries." *Id.* at 158-59. However, in the present case, Nurse Pearson clarified that all of the opinions in her report were "based upon a reasonable degree of nursing certainty." (ECF No. 111-10 at 21.)

Nurse Pearson detailed the system and staff failures that caused Morgan's death. Nurse Pearson's report detailed the violations of the standard of care (*Id.* at 12-20), which were also detained in her affidavit (ECF No. 111-13 at 2-4). The identified violations of the standard of care by Defendants denied Morgan adequate and appropriate care that, according to Nurse Pearson, could have prevented "her unnecessary death." (ECF No. 111-13 at 2.) Those failures included the failure on the part of Intake Nurse Brigido Bayawa, Nursing Supervisor Sastrillo, and Director of Nursing Flores (1) "to follow and implement

established policies set forth to identify patient healthcare needs and risks (Receiving Screening policy)"; (2) "to supervise and train staff (intake nursing staff not following policy nor conducting appropriate Receiving Screenings)" (3) "to provide and have necessary emergency equipment available"; and (4) "to protect Ms. Morgan, in that no suicide risk assessment nor associated precautions were completed." (*Id.* at 2-3.) Nurse Pearson concluded that "system failure and staff failures resulted in Ms. Morgan having no opportunity to answer questions about her medical and mental health history or be evaluated by licensed healthcare professionals (medical nor mental health) upon her return to FMWCC after her escape." (ECF No. 111-10 at 20-21.) And these failures led to her suicide "[l]ess than 40 hours after arrival back at FMWCC." (*Id.* at 21.) Nurse Pearson's statement that the standard of care Defendants violated was necessary to "prevent her unnecessary death," along with her other statements, are sufficient to meet NRS 41A.100(1)'s requirements. This comports with other District of Nevada decisions which caution against granting summary judgment because the doctor's testimony did not include specific language. *See Guerrero v. Wharton*, No. 2:16-cv-01667, 2019 WL 13211006, at *2 (D. Nev. March 26, 2019).

### ii.  Discretionary Act Immunity

Defendants further argue that the Nurse Defendants are entitled to discretionary act immunity. Under Nevada law, no action may be brought against a State employee or officer "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty...whether or not the discretion involved is abused." NRS 41.032(2). The Nevada Supreme Court adopted the *Berkovitz-Gaubert* test for determining whether an act is discretionary. *Armstrong v. Reynolds*, 22 F.4th 1058, 1082 (9th Cir. 2022) (citing *Martinez v. Maruszczak*, 168 P.3d 720, 729 (2007)). For a court to find an act discretionary, "a decision must (1) involve an element of individual judgment or choice and (2) be based on considerations of social, economic, or political policy."

*Id.* (quoting *Martinez*, 168 P.3d at 728). "[I]f the injury-producing conduct is an integral part of governmental policy-making or planning, if the imposition of liability might jeopardize the quality of the government process, or if the legislative or executive branch's power or responsibility would be usurped, immunity will likely attach under the second criterion." *Martinez*, 168 P.3d at 729 (citing *Horta v. Sullivan*, 4 F.3d 2, 19 (1st Cir. 1993)).

While Nurse Bayawa's failure to conduct a mental health assessment and Nurses Flores' and Sastrillo's failure to ensure compliance with mental health screening regulations fulfill the first half of this test (involving an element of individual judgment or choice), they do not meet the second requirement that they involve matters of policy. Defendants argue that Nurse Bayawa's failure to act "involved governmental policy-making regarding the processing and intake of inmates at NDOC facilities." (ECF No. 84 at 50.)  Defendants argue that Nurses Flores' and Sastrillo's failures "involved an analysis of governmental policy concerns in regard to inmate processing and inmate health and safety under the circumstances[.]" (ECF No. 84 at 50.) Defendants fail to explain how the nurses' decisions implicate these alleged policy concerns, particularly when they involved choices to not follow state policies and regulations or fulfill their responsibility to ensure medical staff followed those requirements. Furthermore, the Supreme Court of Nevada explicitly rejected the idea that "diagnostic and treatment decisions" are entitled to discretionary act immunity because they do not include policy considerations. *Martinez*, 168 P.3d at 726. The Nevada Supreme Court warned that to find otherwise "would unacceptably leave a large number of clients and patients with no form of recourse against individuals who fail to act according to the reasonable standards of their profession." *Id.* at 730. Thus, the Court will deny Defendants discretionary act immunity.

///

///

24

### iii.  Statute of Limitations

Defendants move for summary judgment on Plaintiffs' state law claims because they are time-barred. Under Nevada state law, "an action for injury or death against a provider of health care may not be commenced more than 3 years after the date of injury or 1 year after the plaintiff discovers or through the use of reasonable diligence should have discovered the injury, whichever occurs first." NS 41A.097(2). A plaintiff "discovers his legal injury when he knows or, through the use of reasonable diligence, should have known of facts that would put a reasonable person on inquiry notice of his cause of action." *Massey v. Litton*, 669 P.2d 248, 252 (1983). "A person is put on 'inquiry notice' when he or she should have known of facts that 'would lead an ordinarily prudent person to investigate the matter further.'" *Winn v. Sunrise Hosp. & Medical Center*, 277 P.3d 458, 462 (Nev. 2012) (quoting *Black's Law Dictionary* 1165 (9th ed. 2009)). "[T]he appropriate accrual date for the statute of limitations is a question of law only if the facts are uncontroverted." *Id.* (quoting *Day v. Zubel*, 922 P.2d 536, 539 (Nev. 1996)).

Parties dispute when Plaintiffs discovered or should have discovered the injury. Both parties agree that the date of the injury is when Morgan died, which was April 28, 2018, so under the three-year standard, the statute of limitations expired on April 28, 2021. (ECF Nos. 84 at 45; 109 at 36-37.) Defendants argue that Plaintiffs discovered the injury (Morgan's death) the same day that she died because "she blamed NDOC almost immediately for Morgan's death" and first retained legal counsel in May of 2018. (ECF No. 84 at 45.) Defendants cite to an unpublished Nevada Supreme Court case, *Valley Health Sys., LLC v. Eighth Jud. Dis. Ct.*, 497 P.3d 278 (Table) (Nev. 2021) (unpublished disposition) to support their argument that the one-year accrual period should apply "[b]ecause the evidence is irrefutable." (ECF No. 128 at 31.) Defendants also cite as evidence for Plaintiffs being on inquiry notice (1) text messages between Lackey and

Investigator Shields the day after Morgan's death where Lackey states that she knew Morgan was not placed on suicide watch and (2) a phone call where Inspector Shields told Lackey he had told corrections to inform the medical unit to place Morgan on suicide watch. (ECF Nos. 128-11 at 2-4; 128-12.) Plaintiffs counter that the facts of *Valley Health Sys., LLC* are inapplicable to the present case because they did not discover the Nurse Defendants failure to give Morgan a full intake until Defendants' disclosures on April 6, 2021. (ECF No. 109 at 36-38.) Thus, Plaintiffs claim that the one-year accrual period ended April 6, 2022 (one year after the disclosure of Defendant Nurses) and thus their claims were not barred until the end of the three-year accrual period on April 28, 2021. (*Id.* at 35-38.)

The Court finds Plaintiffs' claim is not time-barred. Plaintiffs filed their original complaint, which did not include Nurse Defendants, on April 28, 2020. (*Id.* at 36.) They discovered the Nurse Defendants' involvement only after Defendants' disclosure on April 6, 2021 and then filed claims against the Nurse Defendants that same month, on April 26, 2021.[3] (*Id.*) Thus, Plaintiffs would have had no reason to investigate possible claims against the Medical Defendants specifically (inquiry notice) until after the disclosure alerted them to the improper intake. And, as Plaintiffs point out, they would not have been able to file any professional negligence claims against the Nurse Defendants prior to this "because the required expert affidavit would have been completely hypothetical." (ECF No. 109 at 38.)

The Nevada Supreme Court's decision in *Valley Health System, LLC* does not apply here. As an initial matter, unpublished Nevada Supreme Court decisions issued after January 1, 2016, only have persuasive value. Nev. R. App. P. 36(c)(3). In *Valley Health System, LLC*, the Nevada Supreme Court held that a

---

[3] While Plaintiffs state that they filed the Amended Complaint on August 26, 2021, the document is dated August 27, 2021. (ECF No. 1-2 at 22.)

professional negligence was time barred because the real parties in interest were at the latest on inquiry notice on the date that they filed a complaint with the State Board of Nursing alleging the health care providers did not appropriately monitor and care for the decedent, causing her death. *Valley Health Sys., LLC*, 497 P.3d at 278. The court in *Valley Health System, LLC* was able to identify an accrual date as a matter of law because the date was "uncontroverted;" the fact the plaintiffs were able to make a professional complaint clearly demonstrated they were on inquiry notice to investigate further. *Winn*, 277 P.3d at 462 (quoting *Day*, 922 P.2d at 539). In the present case, Plaintiffs had no reason to believe they should investigate the Nurse Defendants' actions until they received Defendants' disclosure indicating the Nurse Defendants did not conduct a full intake. Thus, the Nevada Supreme Court's decision in *Valley Health System, LLC* does not control this Court's holding.

Since the Court concludes that the statute of limitations expired on April 28, 2021, Plaintiffs' professional negligence claim is not time-barred. Plaintiffs filed their Amended Complaint on April 26, 2021, and thus their filing was timely. (ECF No. 109 at 36.)

### D. QUALIFIED IMMUNITY

Having found Plaintiffs raised a genuine issue of material fact as to whether Nurses Bayawa, Flanigan, and Sastrillo violated state law and the Eighth and Fourteenth Amendments, the Court must now determine whether qualified immunity applies. Qualified immunity shields certain government officials from liability unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The point of shielding officials from liability except when they violate "clearly established" rights is to "ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Id.* (quoting *Saucier v. Katz*, 533

U.S. 194, 206 (2001)). Nonetheless, officials who violate statutory or constitutional rights knowingly or through plain incompetence are not shielded from liability. *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). Thus, if "every 'reasonable official would have understood that what he is doing violates that right,'" then the right is clearly established, and qualified immunity does not provide a defense. *See al-Kidd*, 563 U.S. at 741. For a constitutional or statutory right to be clearly established, there does not need to be a factually indistinguishable case spelling out liability, but existing precedent "must have placed the statutory or constitutional question beyond debate." *Id.* The Ninth Circuit has held that "[i]t is clearly established that the Eighth Amendment protects against deliberate indifference to a detainee's serious risk of suicide." *Conn*, 591 F.3d at 1102 (citing *Cabrales v. Cty. of Los Angeles*, 864 F.2d 1454 (9th Cir. 1988), cert. granted and judgment vacated, 490 U.S. 1087 (1989); *Cavalieri v. Shepard*, 321 F.3d 616, 621 (7th Cir. 2003); *Colburn v. Upper Darby Tp.*, 946 F.2d 1017, 1023 (3d Cir. 1991)).

The parties dispute the proper characterization of the right at issue in this case. Defendants claim the case concerns the right to suicide screening or prevention protocols and cite to *Taylor v. Barkes*, 575 U.S. 822, 826 (2015)), in which the Supreme Court stated that none of its decisions have established "a right to the proper implementation of adequate suicide prevention protocols." (ECF No. 84 at 24.) Plaintiffs instead characterize the right as the right to adequate medical care, and specifically mental health care. (ECF No. 109 at 28.)

The Court agrees with Plaintiffs that the right at issue should be framed as the right to adequate mental health care, which is clearly established. *See, Doty*, 37 F.3d 540, 546 (addressing the right to constitutionally adequate mental health care for prisoners and holding "the requirements for mental health care are the same as those for physical health care needs"); *see also Williams v. County*, No. 2:15-CV-01760-SU, 2016 WL 4745179, at *5 (D. Or. Sept. 12, 2016) (collecting

28

cases, including *Conn* and *Clouthier*) ("Defendants [sic] reliance on *Taylor* is misplaced...As of 2013, the Ninth Circuit has repeatedly held that pretrial detainees[4] have a 'clearly established right' to mental health treatment, including suicide prevention, while in custody.") While those cases refer to pretrial detainees, the Court finds the right clearly established for prisoners too. Though Defendants argue that the right must be specific for convicted and recaptured inmates (ECF No. 128 at 16 n.5.) they fail to support this point citing only to *Kinglsey v. Hendrickson*, 576 U.S. 389 (2015) which they admit is about whether "there exists a single 'deliberate indifference' standard applicable to all § 1983 claims, whether brought by pretrial detainees or by convicted prisoners[,]" not whether a right is clearly established for purposes of qualified immunity. Because the Ninth Circuit has recognized that suicide risk is a serious medical need, the Eighth Amendment protects against deliberate indifference to suicide risk. *See Conn*, 591 F.3d 1081 at 1095. While the Ninth Circuit has differentiated the deliberate indifferent standard applied to pretrial detainee and prisoner claims, foundational to both claims is the "clearly established" right to mental health treatment, including suicide prevention, while in custody. *See Williams*, 2016 WL 4745179, at *5.

Defendants failure to conduct a mental health assessment or ensure nurses under their supervision conducted a mental health assessment clearly violates the right to adequate mental health care. The prison cannot provide adequate mental health care without properly screening prisoners for suicidal ideation and other mental health issues. Accepting all of Plaintiffs' allegations as true, Defendants violated a clearly established constitutional right as to adequate

---

[4] While the cases refer to pretrial detainees, the Court finds the right clearly established for prisoners too. In their reply brief, Defendants argue that the right must be specific for convicted and recaptured inmates, as opposed to pre-trial detainees. (ECF No. 128 at 16 n.5.) However, they only cite to *Kinglsey v. Hendrickson*, 576 U.S. 389 (2015) which they admit is about whether "there exists a single 'deliberate indifference' standard applicable to all § 1983 claims, whether brought by pretrial detainees or by convicted prisoners[,]" not whether a right is clearly established for purposes of qualified immunity.

mental health care and thus the Court denies qualified immunity as to all of the Medical Defendants.

## IV. CONCLUSION

It is therefore ordered that Nurse Defendants' Motion for Summary Judgment (ECF No. 84) is granted in part and denied in part.

It is further ordered that the following claims are dismissed: (1) Negligence; (2) Wrongful Death; (3) Gross Negligence; (4) Neglect of Vulnerable Person; (5) Negligent Hiring, Training and Supervision.

It is further ordered that summary judgment for all other claims is denied.

DATED THIS 29th day of September 2023.


_____

ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE