1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| BONNIE LOPEZ, individually as sister and Special Administrator for the Estate of MELODY MORGAN, deceased; COLLEEN LACKEY, individually as mother of MELODY MORGAN, deceased,<br><br>                Plaintiffs,<br><br>v.<br><br>THE STATE OF NEVADA ex rel. NEVADA DEPARTMENT OF CORRECTIONS, WARDEN DWIGHT NEVEN, individually; GARY PICCININI, ASSISTANT WARDEN, individually; BRYAN SHIELDS, individually; OFFICER JOEL TYNNING, individually; OFFICER KARISSA CURRIER; OFFICER JAZMINA FLANAGAN; NURSE JANE BALAO; NURSE BRIGIDO BAYAWA; NURSE LEILANI FLORES; NURSE ROSEMARY MCCRARY; NURSE MA LITA SASTRILLO; NURSE CHRIS SHIELDS; DOES I through X; and ROE ENTITIES I through X, inclusive,<br><br>                Defendants. | Case No. 2:21-cv-01161-ART-NJK<br><br>ORDER |

19
20
21
22
23
24
25
26
27
28

      This case arises out of the tragic death of Melody Morgan ("Morgan"), who died by suicide on April 28, 2018, after hanging herself at Florence McClure Women's Correctional Center ("Florence McClure"). Plaintiff Bonnie Lopez ("Lopez") is the special administrator for Morgan's estate and is also Morgan's sister. Plaintiff Colleen Lackey ("Lackey") is Morgan and Lopez's mother. She brings this action in her own capacity as the mother and as an heir to the decedent. Plaintiffs' First Amended Complaint ("FAC") alleges the following causes of action: (1) 42 U.S.C. § 1983 (Eighth Amendment – Deliberate Indifference to Serious Medical Need); (2) 42 U.S.C. § 1983 (Fourteenth Amendment – Loss of Familial Association); (3) Negligence; (4) Wrongful Death; (5) Gross Negligence; (6)

Neglect of Vulnerable Person; (7) Negligent Hiring, Training and Supervision; and (8) Professional Negligence. (ECF No. 1-2.)

Before the Court is Defendants Gary Piccinini, Bryan Shields, Dwight Neven, Nevada Department of Corrections, Jane Balao, Christopher Shields, and Rosemarie McCrary's Motion for Summary Judgment (ECF No. 74.)

## I.    BACKGROUND

Plaintiffs allege the following. Decedent Melody Morgan was diagnosed with bipolar disorder, schizophrenia, and multiple personality disorder, and she had approximately three psychiatric hospitalizations. (ECF No. 1-2 at ¶ 31.) Morgan also "had a history of suicidal ideations" and had attempted suicide multiple times since age fourteen. (*Id.* at ¶ 32.) In December 2012, Morgan was arrested and detained for various criminal charges. While detained, she was placed on suicide watch for suicidal ideation. On December 21, 2012, she attempted suicide and was placed on suicide watch. (*Id.* at ¶¶ 33-34.)

In 2013, Morgan pleaded guilty to a felony and was incarcerated at Florence McClure in Las Vegas, Nevada. (*Id.* at ¶36.) Upon admittance at Florence McClure, Morgan's Presentence Investigation Report, Nevada Department of Corrections Transport Form, and other intake forms identified her mental health issues and suicidal ideations. (ECF No. 117-1 at 2; ECF No. 117-2 at 2-4.) Subsequent evaluations at Florence McClure further documented these mental disorders and suicidal tendencies. (ECF No. 117-3 at 3-4.) Morgan was later transferred to the Jean Conservation Camp, a minimum-custody camp in Nevada for female offenders. (ECF No. 1-2 at ¶ 38.) On April 19, 2018, Morgan and another incarcerated individual escaped from the Jean Conservation Camp. (*Id.* at ¶ 39.) Law enforcement apprehended Morgan on April 26, 2018, after her mother, Lackey, reported her location. (*Id.* at ¶¶ 44–45.) Before law enforcement apprehended Morgan, Lackey told Defendant Inspector Bryan Shields that Morgan had a history of mental illness and suicide attempts and requested

officials put Morgan on suicide watch because of the risk she would hurt herself if re-captured, especially if she discovered her mother's role in her reincarceration. (*Id.* at ¶¶ 40–42.; ECF No. 118-6 at 6-7; ECF No. 118-3 at 14-15.) Inspector Shields relayed Lackey's concern to Defendant Lieutenant Karissa Currier at Florence McClure. (ECF No. 1-2 at ¶ 13; ¶ 48.)

Lieutenant Currier and Officer Flanigan dispute what happened after this phone call. According to Lieutenant Currier, on April 26, 2018, she called Officer Flanigan to convey Lackey's concerns to medical staff and have Morgan placed on suicide watch. (ECF No. 118-8 at 4-5.) Lieutenant Currier claims that she ordered Officer Flanigan to inform the medical staff at Florence McClure of Lackey's concern, but Officer Flanigan denies that Lieutenant Currier gave her that command. (ECF No. 1-2 at ¶ 14; ¶¶ 49–50.) Officer Flanigan testified that if she had received such a call, she would have written it down in her notes, added the information to a shift log entry on her computer, asked follow up questions, and notified medical staff. (ECF No. 118-9 at 11-12.) Officer Flanigan stated that she checked her personal notes and shift log and neither documented the April 26 call; however, she did not keep her personal notes. (ECF No. 115-9 at 17.) Lieutenant Currier did not document the call in a shift log either, although she stated in her deposition that shift command does not do shift logs. (ECF No. 115-8 at 10.)

Following Morgan's apprehension, law enforcement took Morgan to Florence McClure on April 26, 2018. (ECF No. 1-2 at ¶ 51.) Morgan was informed that her mother had assisted in locating her. (*Id.* at ¶ 46.) Morgan was housed alone in a cell without any suicide precautions. (*Id.* at 25.) The Florence McClure medical staff did not receive any messages regarding Lackey's concerns nor conduct a psychological or psychiatric evaluation of Morgan. (*Id.* at ¶ 56.) Nurse Bayawa claims that if medical staff had received information concerning Morgan's high suicide risk, then Morgan may have been placed in a suicide room, which is

a stripped cell with a camera, suicide blanket, and check ins every 15 minutes. (ECF No. 115-11 at 4-6.) Two days later, on April 28, 2018, Morgan hanged herself in her cell at Florence McClure. (*Id.* at ¶ 56; 58.)

Various FMWCC correctional officers and nursing staff, including Defendants Balao, Bayawa, Flores, McCrary, Sastrillo, and Chris Shields, responded when Morgan was discovered hanging by a noose made of bed sheets. The nursing staff attempted to resuscitate Morgan. However, compressions were ineffective, and the nurses did not appropriately position and open Morgan's airways as required by Basic Life Support algorithms until approximately six minutes into the process in part due to the lack of necessary equipment (oxygen mask) and lack of appropriate utilization of the equipment (hook up to oxygen tank). (*Id.* at 2.) The ambulance was delayed in the Sally Port upon arrival to the prison and leaving. (*Id.*) The nursing staff admitted they failed to give breaths during the first five minutes of CPR consistent with their training and to properly connect the AMBU bag. (ECF Nos. 112-10 at 108:10-108:25; 112-17 at 51; 112-18 at 52:15-52:22.)

Prison officials later investigated the events. Warden Neven oversees developing and applying policy and procedures in accordance with the Nevada Administrative Code and NRS. (ECF No. 114-6 at 18:2-18:6.) During his deposition, Warden Neven "could not recall whether [he] had an operating procedure or not" for suicide prevention or intervention. (*Id.* at 27:06-27:10.) He also did not believe that correctional officers received any training on assessing inmate suicide risk. (*Id.* at 27:24-28:02.) In addition, when asked about procedures for handling outside calls expressing a concern that an inmate was suicidal, Warden Neven could not recall the procedures being in any written operational procedure or administrative regulation. (*Id.* at 33:23-34:16.) According to Warden Neven's review, "there were some system failures involving the inmate intake process," including "the failure of medical staff to follow intake

administrative regulations and FNWCC operational procedures." (*Id.* at 104:03-104:14.) Warden Neven requested an investigation into the conduct of nurses Leilani Flores and Ma Lita Sastrillo regarding allegations of insubordination and neglect of duty, but he did not request any follow up investigation into the miscommunication between Lieutenant Currier and Officer Flanigan. (*Id.* at 103:05-103:15.) Associate Warden Piccinini testified that Lieutenant Currier did not originally mention any conversations regarding Morgan in her report; Associate Warden Piccinini similarly did not mention in his report that Lieutenant Currier informed him that she received a phone call from Investigator Shields about Lackey's concerns regarding Morgan. (ECF No. 112-19 at 98:09-98:16; 108:21-109:03.) Plaintiffs' former attorney had sent Associate Warden Piccinini a letter on May 11, 2018, instructing him to preserve any documents related to Morgan, yet he admitted he did not preserve text messages from April 28, 2018, regarding Mogan and notes he wrote prior to drafting his report. (*Id.* at 133:04-134:24.)

### III.   LEGAL STANDARD

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting or disputing a fact "must support the assertion by … citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is a sufficient evidentiary basis on which a reasonable fact-finder

could rely to find for the nonmoving party. *Id.*

In determining summary judgment, courts apply a burden-shifting analysis. A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the nonmovant bears the burden at trial, as is the case here, the movant can meet its burden by either (1) presenting evidence to negate an essential element of the nonparty's case; or (2) by demonstrating that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case. See *id.* at 323-24. After the movant has met its burden, the burden shifts to the nonmovant to come forward with specific facts showing a genuine issue of material fact remains for trial. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although "[o]n summary judgment the inferences to be drawn from the underlying facts...must be viewed in the light most favorable to the party opposing the motion," *id.* (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)), the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586-87 (internal citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. 242 at 252. In other words, the non-moving party cannot avoid summary judgment by "relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citing *Angel v. Seattle-First nat. Bank*, 653 F.2d 1293, 1299 (9th Cir. 1981)). Instead, to survive summary judgment, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing admissible evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. 317 at 324.

If the moving party presents evidence that would call for judgment as a matter of law at trial if left uncontroverted, then the respondent must show by

specific facts the existence of a genuine issue for trial. *Anderson*, 477 U.S. 242 at 250. "If, as to any given material fact, evidence produced by the moving party... conflicts with evidence produced by the nonmoving party . . . we must assume the truth of the evidence set forth by the nonmoving party with respect to that material fact." *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013). If reasonable minds could differ on material facts, summary judgment is inappropriate because summary judgment's purpose is to avoid unnecessary trials only when the material facts are undisputed; if not, the case must proceed to the trier of fact. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995) (citing *Lindahl v. Air France*, 930 F.2d 1434, 1436 (9th Cir. 1991)).

**IV. ANALYSIS**

### A. CLAIMS AGAINST BRYAN SHIELDS

In their response to the present motion, Plaintiffs stated they "do not oppose the dismissal of Mr. Bryan Shields." (ECF No. 112 at 2 n.2). Thus, the Court will dismiss all claims against Defendant Inspector Shields.

### B. EIGHTH AMENDMENT CLAIMS

The Court must determine whether Defendants potentially violated the Eighth Amendment. Prison officials violate the Eighth Amendment's cruel and unusual punishments clause when they are "deliberately indifferent" to a prisoner's "serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 102–05 (1976). Such a violation "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988) (citing *Estelle*, 429 U.S. at 105); *see also Stewart v. Aranas*, 32 F.4th 1192, 1195 (9th Cir. 2022) (requiring a prisoner to demonstrate that any alleged delay in medical care led to further injury).

A claim for deliberate indifference to serious medical needs can be asserted by a pretrial detainee or a prisoner. *Horton by Horton v. City of Santa Maria,* 915

F.3d 592, 599 (9th Cir. 2019) (discussing standards for deliberate indifference). A pretrial detainee's claim deliberate indifference is brought as a Due Process violation under the Fourteenth Amendment, while a prisoner's similar claim is a violation of the Eighth Amendment. *Id.* As explained in *Horton,* while the elements of both claims are the same, they differ in the required showing of deliberate indifference. *Id.* at 602. To show deliberate indifference, the plaintiff must provide evidence of two things: (1) "a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain"; and (2) "the defendant's response to the need was deliberately indifferent." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations and quotations omitted).

The Ninth Circuit differentiated these claims in *Gordon* in 2018 when it held that a pretrial detainee's Fourteenth Amendment claim for deliberate indifference is analyzed under a "purely objective standard." *Horton*, 915 F.3d at 602 (citing *Gordon v. County of Orange*, 888 F.3d 1118, 1125-26 (9th Cir. 2018)). Under *Gordon,* to prove deliberate indifference a pretrial detainee must show that there was "a substantial risk of serious harm to the plaintiff that could have been eliminated through reasonable and available measures that the officer did not take, thus causing injury that the plaintiff suffered." *Id.* (quoting standard from *Castro*, 833 F.3d at 1068-71, that was adopted in *Gordon*, 888 F.3d at 1125-26). In contrast, a prisoner's claim for deliberate indifference under the Eighth Amendment is analyzed under a partially *subjective* standard that requires a plaintiff to show "an objective risk of harm and a subjective awareness of that harm." *Id.* at 600*, citing Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cir. 2010), vacated, 563 U.S. 915 (2011), opinion reinstated in relevant part, 658 F.3d 897 (9th Cir. 2011) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

Because the serious medical need here involved risk of suicide, the Ninth Circuit's holdings in *Conn* and *Clouthier v. County of Contra Costa,* 591 F.3d 1232,

8

1241-43 (9th Cir. 2010) are particularly relevant. *See Conn*, 591 F.3d at 1105 (reversing summary judgment in favor of officers who failed to report risk of detainee's suicide attempt and threats); *Clouthier*, 591 F.3d at 1254 (reversing summary judgment in favor of mental health worker who removed suicide prevention measures). Although *Conn* and *Clouthier* each concerned pretrial detainees, both cases were decided before *Gordon*, so the court analyzed the claims under the then-current Eighth Amendment test. *Horton*, 915 F.3d 592 (citing *Conn*, 591 F.3d at 1095). To show deliberate indifference in *Conn*, the plaintiff was required to show "an objective risk of harm and a subjective awareness of that harm.*" Horton*, 915 F.3d 592 (citing *Conn*, 591 F.3d at 1095). Because Morgan was a prisoner, the claims here are governed by the Eighth Amendment standard, which is the same standard applied in *Conn* and *Clouthier*.

### 1. SERIOUS MEDICAL NEED

The Ninth Circuit has held that "[a] heightened suicide risk or an attempted suicide is a serious medical need." *Conn*, 591 F.3d at 1095 (citing, inter alia, *Doty v. County of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994)). "The requirements for mental health care are the same as those for physical health care needs."). *Doty* 37 F.3d at 546. While *Conn* involved Fourteenth Amendment Due Process claims brought on behalf of a pretrial detainee, the "serious medical need" analysis is the same for prisoner Eighth Amendment claims. *Id.* Here, Defendants agree that a manifest suicide risk is a serious medical need. (ECF No. 84 at 19.)

### 2. INDIFFERENCE TO THAT NEED

To prove deliberate indifference under the Eighth Amendment, Plaintiffs must meet a "'subjective deliberate indifference' standard." *Sandoval v. County of San Diego*, 985 F.3d 657, 667 (9th Cir. 2021) (internal citations omitted). This requires Plaintiffs to show that Defendants were "(a) *subjectively aware* of the serious medical need and (b) failed to adequately respond." *Conn*, 591 F.3d 1081 at 1096 (internal citations omitted) (emphasis in original). To fulfill the subjective

requirement for deliberate indifference, Plaintiffs "must demonstrate that the risk was obvious or provide other circumstantial or direct evidence that the prison officials were aware of the substantial risk to [the defendants'] safety. *Lemire*, 726 F.3d at 1078 (citing *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010)). "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* (quoting *Farmer*, 511 U.S. at 842). Plaintiffs must also show "that there was no reasonable justification for exposing the inmates to the risk." *Id.* (citing *Thomas*, 611 F.3d at 1150). "A prison official's justification for exposing inmates to a substantial risk of harm is reasonable only if it represents a proportionate response to the penological circumstances in light of the severity of the risk to which the inmates are exposed." *Id.* at 1079 (citing *Thomas*, 611 F.3d at 154-55). Supervisors can be held liable under § 1983 through culpable action or inaction. The Ninth Circuit has recognized that "the supervisor need not be 'directly and personally involved in the same way as are the individual officers who are on the scene inflicting the constitutional injury.'" *Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011) (quoting *Larez v. City of Los Angeles*, 946 F.2d 630, 645 (9th Cir. 1991)). "Rather, the supervisor's participation could include his 'own culpable action or inaction in the training, supervision, or control of his subordinates,' 'his acquiescence in the constitutional deprivations of which the complaint is made,' or 'conduct that showed a reckless or callous indifference to the rights of others.'" *Id.* (quoting *Larez*, 946 F.2d at 646).

### a. Warden Dwight Neven and Associate Warden Gary Piccinini

Plaintiffs seek to hold Warden Neven and Associate Warden Piccinini liable based on their roles in developing operating procedures and ensuring staff are properly trained. Warden Neven was responsible for the "administrative application of departmental policy, development of operational procedures, and

the enforcement of Nevada Administrative Code and NRS as dictated by administrative regulations." (ECF No. 114-6 at 18:02-18:06.) He had discretion in creating operating procedures for the prison. (*Id.* at 20:16-20:20.) During his deposition, Warden Neven could not recall any FMWCC operating procedure related to suicide prevention or intervention. (*Id.* at 27:06-27:10.) While he agreed that a variety of factors could be helpful in assessing inmate suicide risk, including comments by the inmate during arrest, transport, or screening, officers' observations of unusual inmate behavior, screenings conducted by medical health professionals, inmate medical history, and comments from family members, none of these factors were listed in any medical directive or administrative regulation. (*Id.* at 59:01-61:12.) After Morgan's death, FMWCC changed its policy so that all new arriving inmates received complete intakes, everyone knew their expectations, and all responders received further training. (*Id.* at 64:15-64:23; 66:01-66:08.) Plaintiffs allege these facts demonstrate "an obvious lack of training before April 28, 2018" and "no guidance as to sufficient suicide prevention policies. (ECF No. 112 at 13-14.)

The Court finds Plaintiffs' allegations sufficient to raise a genuine issue of material fact as to whether Warden Neven failed to adequately respond to Morgan's known suicide risk. A supervisor can be held liable under the Eighth Amendment for "his 'own culpable action or inaction in the training, supervision, or control of his subordinates.'" *Starr*, 652 F.3d at 1205 (quoting *Larez,* 946 F.2d at 646). A reasonable jury could find that Warden Neven alleged failure to develop appropriate suicide prevention policies and demonstrated deliberate indifference to all inmates with serious suicidal ideations.

A reasonable jury could similarly find that Associate Warden Piccinini was deliberately indifferent to Morgan's serious medical needs. Associate Warden Piccinini admitted that he is responsible for responding to "serious incidents." (ECF No. 112-19 at 49:16-49:19.) Associate Warden Piccinini did not believe that

he ever had the lieutenants train staff on suicide prevention and intervention. (*Id.* at 36:02-36:06.) He also did not remember if he ever drafted any operating procedures informing correction officers how to deal with suicide prevention and intervention. (*Id.* at 36:07-36:11.) Associate Warden Piccinini did not believe there was any training instructing staff to contact their supervisor if they were concerned an inmate had suicidal tendencies. (*Id.* at 38:01-38:06.) Associate Warden Piccinini was aware that Lieutenant Currier's original report did not include any of her August 26, 2018 conversations about Morgan, and yet he expressed that he was "not concerned" that Lieutenant Currier added this to her report over a week later. (*Id.* at 108:21-109:19.) Associate Warden Piccinini did not include in his report the fact that Lieutenant Currier informed him about Inspector Shield's call. (*Id.* at 98:09-98:16.) Furthermore, Plaintiffs' former attorney had sent Associate Warden Piccinini a letter on May 11, 2018, instructing him to preserve any documents related to Morgan, yet he admitted he failed to preserve text messages from April 28, 2018, regarding Morgan and notes he wrote prior to drafting his report. (*Id.* at 133:04-134:24.) Based on this information, a reasonable jury could conclude that Associate Warden Piccinini was deliberately indifferent to Morgan's serious risk of suicide.

While Warden Neven and Associate Warden Piccinini argue that "Plaintiffs cannot prove that either gentleman was aware of the facts from which the inference could be drawn that Morgan was at a substantial risk of serious harm," this misstates the legal standard. They did not need to know any facts demonstrating Morgan specifically was in substantial danger of suicide; instead, they simply needed to know their actions or inactions "would pose a substantial risk of serious harm to someone in [Morgan's] situation, not simply whether they were subjectively aware of [Morgan's] specific medical needs." *Lemire v. Cal. Dep't of Corr. & Rehab*, 726 F.3d 1062, 1078-79 (9th Cir. 2013) (citing *Gibson v. Cty. of Washoe*, 290 F.3d 1175, 1191 (9th Cir. 2002), *overruled on other grounds by*

1   *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016)). Because a
2   lack of training and policies concerning suicide prevention and intervention could
3   pose such a substantial risk to a suicidal inmate, the Court finds Defendants'
4   argument unpersuasive.

5           **b. Jane Balao, Christopher Shields, Rosemarie McCrary,**
6           **and Brigado Bayawa[1]**

7           The Court next considers whether Nurses Jane Balao, Christopher Shields,
8   Rosemarie McCrary, and Brigado Bayawa were deliberately indifferent to
9   Morgan's serious risk of suicide. Defendants claim that none of these individuals
10  (besides Bayawa) were on intake duty when Morgan arrived at FMCC nor had any
11  training or responsibility for conducting evaluations of inmates' mental states.
12  (ECF No. 74 at 12.) Furthermore, Defendants argue that they immediately
13  rendered emergency medical care after Morgan committed suicide. (*Id.*; ECF No.
14  84 at 30.) However, Plaintiffs allege that the nurses were deliberately indifferent
15  when they provided subpar medical treatment when Morgan was found hanging
16  in her cell. (ECF No. 112 at 16-17.) In support of this claim, Plaintiffs rely on the
17  nurses' depositions in which they admit to providing subpar CPR. Specifically,
18  Plaintiffs cite to the nurses' testimony that they failed to provide breaths during
19  CPR as instructed in training (ECF Nos. 112-10 at 108:17-108:25; 112-17 at
20  51:8-51:17; 112-18 at 52:15-52:22.)

21          The Court concludes that a reasonable jury could find the nurses
22  deliberately indifferent to Morgan when they provided subpar medical treatment.
23  The Ninth Circuit, along with many other circuits, has held that "failing to provide
24  CPR or other life-saving measures to an inmate in obvious need can provide the
25  basis for liability under § 1983 for deliberate indifference." *Lemire*, 726 F.3d at
26  1082 (internal citations omitted). While the Ninth Circuit has refused to find

27  _____

28  [1] Nurse Bayawa was represented by different counsel than those representing the other nurses.
    This order discusses all of the nurses together because they face liability for the same events.

officers deliberately indifferent for failing to provide CPR when their behavior "was not deficient,"[2] here Defendants admit their medical treatment was subpar and inconsistent with their medical training. (ECF Nos. 112-10 at 108:17-108:25; 112-17 at 51:8-51:17; 112-18 at 52:15-52:22.) In addition, the Ninth Circuit has found trained medical professionals deliberately indifferent when they failed to follow "[s]tandard nursing protocol" and acted contrary to how "every reasonable nurse" would in the situation. *Sandoval*, 985 F.3d at 679. Thus, the nurses' failure to provide CPR in line with medical training and standard protocol may constitute deliberate indifference.

### 3. CAUSATION

The Court next considers whether the alleged deliberate indifference was both an actual and a proximate cause of Plaintiffs' harm. *Castro*, 797 F.3d at 667 (citing *Lemire*, 726 F.3d at 1074). This causation analysis applies to both Eighth and Fourteenth Amendment claims. *See Gordon,* 888 F.3d at 1125 (describing the requirements for a pretrial detainee's Fourteenth Amendment medical care claim, including a causation requirement); *Lemire*, 726 F.3d at 1074 (citing *Conn*, 591 F.3d at 1098-01) (explaining that Eighth Amendment deliberate indifference claims require a showing of both actual and proximate cause). "[P]laintiffs who have already demonstrated a triable issue of fact as to whether prison officials exposed them to a substantial risk of harm, and who actually suffered precisely [that foreseeable harm], will also typically be able to demonstrate a triable issue of fact as to causation." *Lemire*, 726 F.3d at 1080-81 (citing *Conn*, 591 F.3d at 1098-1101; *White*, 901 F.2d 1501, 1505 (9th Cir. 1990)). Conduct is an actual cause of injury "only if the injury would not have occurred 'but for' that conduct." *White*, 901 F.2d at 1505 (internal citations omitted). Actual or "but-for" causation is "purely a question of fact." *Robinson v. York*, 566 F.3d 817, 825 (9th Cir. 2009).

---

[2] *Lemire*, 726 F.3d at 1083 (discussing the Ninth Circuit's refusal to find officers deliberately indifferent in *Cartwright v. City of Concord*, 856 F.2d 1437, 1438 (9th Cir. 1988) and *Maddox v. City of Los Angeles,* 792 F.2d 1408, 1415 (9th Cir. 1986)).

"Once it is established that the defendant's conduct has in fact been one of the causes of the plaintiff's injury, there remains the question whether the defendant should be legally responsible for the injury"—in other words, whether the defendant's actions were a proximate cause. *White*, 901 F.2d at 1506. While a defendant "'is not the proximate cause of [the plaintiff]'s alleged injuries if another cause intervenes and supersedes their liability for the subsequent events[,] . . . foreseeable intervening causes . . . will not supersede the defendant's responsibility.'" *Conn*, 591 F.3d at 1101 (quoting *White*, 901 F.2d at 1506). "'If reasonable persons could differ' on the question of causation then 'summary judgment is inappropriate and the question should be left to a jury.'" *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1080 (9th Cir. 2013) (quoting *White*, 901 F.2d at 1506).

### a. **Warden Dwight Neven and Associate Warden Gary Piccinini**

The question of causation as to Defendants Neven and Piccinini should be left to the jury. As in *Conn*, the Court is "satisfied . . . that [Plaintiffs] presented sufficient evidence of actual and proximate causation to defeat summary judgment and give rise to a jury question whether [Warden Neven and Associate Warden Piccinini] caused [Morgan's] eventual suicide." *Conn*, 591 F.3d at 1098. Regarding actual cause, construing all the evidence in the light most favorable to Plaintiffs, the Court finds that a reasonable jury could conclude that if the wardens had developed procedures and training related to suicide prevention, then Morgan's suicide could have been prevented.

As for proximate cause, the Court finds that Plaintiffs have "presented sufficient evidence of foreseeability that the question of proximate cause must be decided by a jury." *Id.* at 1102. A reasonable jury could conclude that Morgan's suicide was a "foreseeable and normal result" of the wardens' lack of suicide prevention measures and training. *See White*, 901 F.2d at 1506.

In sum, the Court finds Plaintiffs' allegations sufficient to show genuine issues of material facts as to whether the wardens were deliberately indifferent to Morgan's heightened risk of suicide in violation of the Eighth Amendment.

### b. Jane Balao, Christopher Shields, Rosemarie McCrary, and Brigado Bayawa

The Court similarly finds that a jury should decide the issue of causation with regards to the Nurse Defendants. A reasonable jury could find that the nurses were the actual cause of Morgan's death because she might not have died but for their failure to provide CPR in line with their training. Turning to proximate cause, a reasonable jury could conclude that Morgan's death was a "foreseeable and normal result" of the nurses' failure to provide appropriate CPR. *See, e.g.*, *Lemire*, 726 F.3d at 1083 (reversing the district court's grant of summary judgment to officers who failed to provide CPR to inmate who committed suicide).

### C. FOURTEENTH AMENDMENT CLAIMS

The Court turns to Plaintiffs' Fourteenth Amendment claims for impermissible interference with familial association against Warden Neven, Associate Warden Piccinini, Nurse Balao, Nurse McCrary, and Nurse Shields. "Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct." *Lemire*, 726 F.3d at 1075 (citing *Wilkinson v. Torres*, 610 F.3d 546. 554 (9th Cir. 2010)).

Officers violate the Fourteenth Amendment's substantive due process protections when their "conduct 'shocks the conscience.'" *Nicholson v. City of Los Angeles*, 935 F.3d 685, 692-93 (9th Cir. 2019) (quoting *Wilkinson*, 610 F.3d at 554). To determine whether the conduct shocks the conscience, the "critical consideration [is] whether the circumstances are such that actual deliberation is practical." *Nicholson*, 935 F.3d at 692-93 (quoting *Porter v. Osborn*, 546 F.3d

1131, 1137 (9th Cir. 2008) (quoting *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998)). If actual deliberation is practical, then "an officer's 'deliberate indifference' may suffice to shock the conscience," *id.* (quoting *Wilkinson*, 610 F.3d at 554), and the plaintiff may prevail by showing that the officer "disregarded a known or obvious consequence of his action." *Id.* (quoting *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011)). "The 'deliberate-indifference inquiry should go to the jury if any rational factfinder could find this requisite mental state.'" *Nicholson,* 935 F.3d at 693.

Courts have recognized that in certain situations, like high-speed police chases, officers have no time to deliberate. As the court explained in *Nicholson,* "[w]e have previously carved out a narrow situation—high-speed police car chases—in which we have found, categorically, that an officer does not have time to deliberate. *Id.* at 694 (citing *Bingue v. Prunchak*, 512 F.3d 1169, 1177 (9th Cir. 2008)). To claims involving a high-speed police chase, the court applies the "intent to harm" standard, whereas in other situations the court may apply the "deliberate indifference" standard depending on the circumstances. *Nicholson,* 935 F.3d at 694 (citing *Bingue*, 512 F.3d 1176) In holding that "the intent to harm" standard "applies to all high-speed police chases," the court reasoned that such a rule best accounts for an officer's "repeated split-second decisions about how best to apprehend the fleeing suspect in a manner that will minimize risk to [the officer's] own safety and the safety of the general public." *Id.* This is because an officer chasing a fleeing suspect has "no time for reflection and precious little time for deliberation concerning either the decision to join the chase in the first place or the serial decisions about how best to pursue the suspect." *Id.* The "purpose to harm" standard has also been applied to law enforcement confrontations with suspects that are life-threatening and "rapidly escalating" *Id.* at 694-95 (discussing *Porter*, 546 F.3d at 1139 (police officers had not time to deliberate when suspect was driving toward them, attempting to run them over)

and *Moreland v. Las Vegas Metropolitan Police Dept.*, 159 F.3d 365, 368 (9th Cir. 1998)(officers responding to active gunfight had no opportunity to deliberate in light of the "immediate risk of serious harm or death to the many innocent individuals trapped in the parking lot").

The Court acknowledged in *Nicholson* that the deliberate indifference standard, not the intent to harm standard, applies when there is no "rapidly escalating" confrontation or "extreme emergency." *Nicholson,* 935 F.3d at 694. In *Nicholson*, the Court held that the deliberate indifference standard applied to a situation in which two officers fired shots at four teenagers whom they encountered in an alley. *Id.* at 694-95. The officers believed that they saw one of the teenagers pointing a handgun at another. The first officer, Officer Gutierrez, "immediately jumped out of the car and ran into the alley" without talking to the other officer. *Id.* at 689. "A few seconds after he entered the alley, Officer Gutierrez fired at least three shots, one of which hit [one of the minor bystanders] J.N.G. in the back." *Id.* Unlike a high-speed chase or escalating confrontation with a suspect, this was a "minimal information" situation in which the officer must take some time to assess the situation. *Id.* at 695.

Whether the officers had time to deliberate may be an issue for the fact finder. In *Nicholson,* the Ninth Circuit agreed with the district court that "'[a] finder of fact could conclude...that Gutierrez disregarded the known or obvious risks of injury to J.H. and J.N.G. when he fired at Sanders without taking time to assess the situation.'" *Id.* at 693. Because there was "a triable issue on whether 'deliberation was practical under the circumstances,'" the court refused to find that the district court should have applied a "purpose to harm" standard. *Id.* at 694-95.

The Ninth Circuit has similarly applied the deliberate indifference standard in cases in which "officers [had] ample time to correct their obviously mistaken detention of the wrong individual, but nonetheless fail[ed] to do so[.]" *Porter*, 546

18

F.3d at 1139 (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 684 (9th Cir. 2001). The present case is more similar to these deliberate indifference cases because the nurses likely could have corrected their subpar CPR well before six minutes passed and they were not facing competing concerns in the moment.

While the Ninth Circuit has not directly addressed the proper standard to apply in a case involving a prison suicide, the Supreme Court expressed support for using the deliberate indifference standard for Fourteenth Amendment claims involving pretrial detainees' medical needs. In *County of Sacramento v. Lewis*, the Supreme Court, in a discussion of the "shock the conscience" standard, stated that since deliberate indifference may suffice for Eighth Amendment prisoner deliberate indifference to serious medical needs claims, "it follows that such deliberately indifferent conduct must also be enough to satisfy the fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial[.]" 523 U.S. at 850 (internal citations omitted). Later in the case, the Court recognized "attention to the markedly different circumstances of normal pretrial custody and high-speed law enforcement chases shows why deliberate indifference that shocks in the one case is less egregious in the other[.]" *Id.* at 851. Thus, the Supreme Court recognized that courts should evaluate medical claims brought under the Fourteenth Amendment using a deliberate indifference standard and viewed custodial cases as fundamentally different from high-speed chases.

Furthermore, other circuits have applied the deliberate indifference standard in Fourteenth Amendment prison suicide cases. For instance, in *Bradich ex rel. Estate of Bradich v. City of Chicago*, the Seventh Circuit reversed the district court's grant of summary judgment to officers who waited ten minutes to request help after finding a detainee hanging in his cell. 413 F.3d 688, 691 (7th Cir. 2005). Even though one of the officers had CPR training, the officers simply "shouted at, slapped, and shook Bradich in an attempt to restart his

breathing." *Id.* The Court applied a deliberate indifference standard and found that summary judgment was inappropriate based on the factual record. *Id.* at 692. In both *Bradich* and the present case, officials with at least some of them having medical training took significant time to render appropriate medical care. *Bradich* provides persuasive authority that this Court should apply the deliberate indifference standard here, deny summary judgment, and leave further decisions to the jury.

Here the questions are whether a factfinder could conclude that the wardens had time to deliberate on whether to provide training and policies related to suicide prevention and whether the nurse defendants who responded to Morgan's suicide had time to deliberate with respect to promptly attempting CPR without following proper procedures.

### 1. Warden Dwight Neven and Associate Warden Gary Piccinini

Summary judgment on the Fourteenth Amendment claim against Warden Neven and Associate Warden Piccinini is inappropriate because, as Defendants concede, "it could be argued [that they] had time to deliberate." (ECF No. 74 at 14.) Both of these Defendants had time to deliberate whether to provide training and policies related to suicide prevention. Thus, Plaintiff must show these Defendants were deliberately indifferent to Morgan's serious risk of suicide.

The wardens can still be held liable for violating the Fourteenth Amendment even if they lacked any personal knowledge of Morgan's suicide risk. Defendants argue that the wardens "were not deliberately indifferent to a risk of ham to Morgan because none of them knew of and chose to ignore an excessive risk to Morgan." (*Id.*) But the wardens needed to only know that their actions or inactions "would pose a substantial risk of serious harm to someone in [Morgan's] situation, not simply whether they were subjectively aware of [Morgan's] specific medical needs." *Lemire*, 726 F.3d at 1077-78 (citing *Gibson v. Cty. of Washoe*, 290 F.3d 1175, 1191 (9th Cir. 2002), *overruled on other grounds by Castro v. Cty.*

*of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016)). Because a reasonable jury could conclude that the wardens were aware that a lack of policies and training concerning suicide prevention could result in inmates committing suicide, the Court finds Defendants' argument unpersuasive.

As discussed in the Eighth Amendment section, since this Court finds Plaintiffs' allegations sufficient to raise a genuine issue of material fact concerning whether the wardens acted with deliberate indifference, the Court will not grant summary judgment on this basis. *See Lemire*, 726 F.3d at 1075 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 849-50 (1998) ("Just as the deliberate indifference of prison officials to the medical needs of prisoners may support Eighth Amendment liability, such indifference may also 'rise to the conscience-shocking level' required for a substantive due process violation.")

### 2. Jane Balao, Christopher Shields, Rosemarie McCrary, and Brigado Bayawa

The nurses are not entitled to summary judgment on the Fourteenth Amendment claims. In their motion for summary judgment, Defendants state that "[n]ot a single one of the Nurses' [sic] cold be describes [sic] as having acted with a purpose to harm Morgan" because each one "sprung immediately into action to try to save her life." (ECF Nos. 74 at 14; 84 at 30.) In their response, Plaintiffs do not address Defendants' reference to the purpose to harm standard and instead incorporate their Eighth Amendment arguments in support of their claim that "[i]t is for the jury to decide if Defendants were deliberately indifferent when they performed substandard CPR." (ECF No. 112 at 17.) This Court finds that a reasonable jury could conclude that the nurses had time to deliberate during the six minutes they spent attempting CPR without following proper procedures. At minimum, there exists a factual issue as to whether deliberation was practical under the circumstances, so the Fourteenth Amendment claim should be resolved by the jury. *See Nicholson*, 935 F.3d at 694-95 (internal

citations omitted) (refusing to find that the district court should have applied a purpose to harm standard because there was "a triable issue on whether deliberation was practical under the circumstances").

A reasonable jury may find that the nurses in the present case could have corrected their subpar CPR much sooner than six minutes after beginning to render care. Thus, the Court will deny the motion for summary judgment and allow a jury to hear the Fourteenth Amendment claim.

### D. STATE LAW CLAIMS

#### 1. Causation

Because this Court finds that a jury must resolve the question of actual and proximate cause, it would be inappropriate to grant Defendants' requests for summary judgment on the state law claims. In their motions for summary judgment, Defendants argue that due to the intake nurses' failure to conduct a mental health assessment, "[t]he lack of causation warrants summary judgment on the state law claims[.]" (ECF No. 74 at 18.) However, as discussed above, a jury could reasonably conclude the wardens' and nurses' conduct was both an actual and proximate cause of Morgan's death.

#### 2. Negligence Claims Against Nurses

Defendants argue that Plaintiffs' negligence claims against the nurse defendants can only be brought as professional negligence claims, and thus the Court must dismiss Plaintiffs' negligence, gross negligence, wrongful death, and neglect of a vulnerable person claims. (*Id.* at 19.) Because the Court agrees with the Defendants, the Court will dismiss these claims.

Nevada has specific laws addressing professional negligence. It defines professional negligence as "the failure of a provider of health care, in rendering services, to use the reasonable care, skill, or knowledge ordinarily used under similar circumstances by similarly trained and experienced providers of health care. NRS 41A.015 (2015). "Providers of health care" includes licensed nurses.

NRS 41A.017 (2019). Plaintiffs must include a supporting affidavit from a medical expert when making professional negligence claims or else the district court must dismiss the action without prejudice. NRS 41A.071 (2022).

Courts are empowered to determine if a claim sounds in ordinary or professional negligence. "If the alleged breach involves 'medical judgment, diagnosis, or treatment,' it is likely a claim for medical malpractice." *Estate of Curtis v. South Las Vegas Medical Investors, LLC.*, 466 P.3d 1263, 1267 (Nev. 2020) (quoting *Szymborski v. Spring Mountain Treatment Center*, 403 P.3d 1280, 1284 (Nev. 2017)). "Thus, 'if the jury can only evaluate the plaintiff's claim after presentation of the standards of care by a medical expert, then it is a [professional negligence] claim.'" *Id.* (quoting *Szymborski*, 403 P.3d at 642). "If, on the other hand, the reasonableness of the healthcare provider's actions can be evaluated by jurors on the basis of their common knowledge and experience, then the claim is likely based in ordinary negligence." *Id.* (citing *Szymborski*, 403 P.3d at 642). Because the distinction between professional and ordinary negligence can be subtle, courts look to the "'gravamen or substantial point or essence'" of each claim to make the necessary determination. *Id.* (quoting *Szymborski*, 403 P.3d at 642-43).

In the narrow set of cases "where the negligence alleged involves a medical diagnosis, judgment, or treatment but the jury is capable of evaluating the reasonableness of the health care provider's actions using common knowledge and experience" the court may not require a medical affidavit. *Id.* at 1267. The exception only applies in "rare situations" where the claim does not raise "questions of medical judgment beyond the realm of common knowledge and experience." *Id.* (quoting *Bryant v. Oakpointe Village Nursing Ctr., Inc.*, 684 N.W. 2d 864, 871 (Mich. 2004)).

Because Plaintiffs concede that their state law claims sound in professional negligence (ECF No. 112 at 26), the question is whether their ordinary negligence-

based claims must be dismissed.  Plaintiffs argue that "the legal inquiry is not whether other claims become subsumed into a professional negligence claim but whether the <u>affidavit requirement</u> in NRS 41A.071 applies to those claims as well." (*Id.*) (emphasis in original). Plaintiffs cite as evidence *Schwarts v. Univ. Med. Ctr. of S. Nevada*, 460 P.3d 25 (Nev. 2020) (unpublished) and *Yafchak v. S. Las Vegas Med. Invs.,* LLC, 138 Nev. Adv. Op. 70, 519 P.3d 37 (2022). In *Schwarts,* the relevant claim was dismissed based on failure to file a required affidavit when proving the civil conspiracy claim necessarily required showing professional negligence. *Schwarts*, 460 P.3d at 25. In *Yafchak* the question was whether the claims sounded in professional negligence. *See Yafchak,* 519 P.3d at 39. The court in *Yafchak* reversed the district court's order dismissal of Yafchak's complaint because it erred "in summarily concluding that LCC met its burden in proving that Yafchak's allegations sounded in professional negligence" and remanded the case for further proceedings to develop the factual record to clarify if the claims sounded in professional negligence or elder abuse. *Id.* at 39-41.

When, as here, it is undisputed that the claims sound in professional negligence, it appears that ordinary negligence claims must be dismissed. *See Estate of Cronin v. G4 Dental Enterprises, LLC,* 526 P.3d 1111 (Nev. App. 2023). In *Estate of Cronin*, the Nevada Court of Appeals upheld the dismissal of negligence claims that are actually rooted in professional negligence. *See* 526 P.3d at 1111 ("Their judgment at each stage of John's care raises questions beyond what common knowledge and experience provide, so the allegations related to John's treatment arise from medical negligence and were properly dismissed as general negligence claims.") Here Plaintiffs have failed to show why this Court should allow Plaintiffs to proceed on their ordinary negligence claims when they admit the claims sound in professional negligence. As such, the Court will dismiss all of the negligence claims against the nurses except the professional negligence claims.

### 3. Statute of Limitations

Defendants move for summary judgment on Plaintiffs' state law claims because they are time-barred. Under Nevada state law, "an action for injury or death against a provider of health care may not be commenced more than 3 years after the date of injury or 1 year after the plaintiff discovers or through the use of reasonable diligence should have discovered the injury, whichever occurs first." NS 41A.097(2). A plaintiff "discovers his legal injury when he knows or, through the use of reasonable diligence, should have known of facts that would put a reasonable person on inquiry notice of his cause of action." *Massey v. Litton*, 669 P.2d 248, 252 (1983). "A person is put on 'inquiry notice' when he or she should have known of facts that 'would lead an ordinarily prudent person to investigate the matter further.'" *Winn v. Sunrise Hosp. & Medical Center*, 277 P.3d 458, 462 (Nev. 2012) (quoting *Black's Law Dictionary* 1165 (9th ed. 2009)). "[T]he appropriate accrual date for the statute of limitations is a question of law only if the facts are uncontroverted." *Id.* (quoting *Day v. Zubel*, 922 P.2d 536, 539 (Nev. 1996)).

Parties dispute when Plaintiffs discovered or should have discovered the injury. Both parties agree that the date of the injury is when Morgan died, which was April 28, 2018, so under the three-year standard, the statute of limitations expired on April 28, 2021. (ECF Nos. 74 at 20; 112 at 21-22.) Defendants argue that Plaintiffs discovered the injury (Morgan's death) the same day that she died because "she blamed NDOC almost immediately for Morgan's death" and first retained legal counsel in May of 2018. (ECF No. 84 at 45.) Defendants cite to an unpublished Nevada Supreme Court case, *Valley Health Sys., LLC v. Eighth Jud. Dis. Ct.*, 497 P.3d 278 (Table) (Nev. 2021) (unpublished disposition) to support their argument that the one-year accrual period should apply "[b]ecause the evidence is irrefutable." (ECF No. 128 at 31.) Defendants also cite as evidence for Plaintiffs being on inquiry notice (1) text messages between Lackey and

Investigator Shields the day after Morgan's death where Lackey states that she knew Morgan was not placed on suicide watch and (2) a phone call where Inspector Shields told Lackey he had told corrections to inform the medical unit to place Morgan on suicide watch. (ECF Nos. 128-11 at 2-4; 128-12.) Plaintiffs counter that the facts of *Valley Health Sys., LLC* are inapplicable to the present case because they did not discover the Nurse Defendants failure to give Morgan a full intake until Defendants' disclosures on April 6, 2021. (ECF No. 109 at 36-38.) Thus, Plaintiffs claim that the one-year accrual period ended April 6, 2022 (one year after the disclosure of Defendant Nurses) and thus their claims were not barred until the end of the three-year accrual period on April 28, 2021. (*Id.* at 35-38.)

The Court finds Plaintiffs' claim is not time-barred. Plaintiffs filed their original complaint, which did not include Nurse Defendants, on April 28, 2020. (*Id.* at 36.) They discovered the Nurse Defendants' involvement only after Defendants' disclosure on April 6, 2021, and then filed claims against the Nurse Defendants that same month, on April 26, 2021.[3] (*Id.*) Thus, Plaintiffs would have had no reason to investigate possible claims against the Medical Defendants or be on inquiry notice until after the disclosure alerted them to the improper intake. And, as Plaintiffs point out, they would not have been able to file any professional negligence claims against the Nurse Defendants prior to this "because the required expert affidavit would have been completely hypothetical." (ECF No. 109 at 38.)

The Nevada Supreme Court's decision in *Valley Health System, LLC* does not apply here. As an initial matter, unpublished Nevada Supreme Court decisions issued after January 1, 2016, only have persuasive value. Nev. R. App. P. 36(c)(3). In *Valley Health System, LLC*, the Nevada Supreme Court held that a

---

[3] While Plaintiffs state that they filed the Amended Complaint on August 26, 2021, the document is dated August 27, 2021. (ECF No. 1-2 at 22.)

professional negligence was time barred because the real parties in interest were at the latest on inquiry notice on the date that they filed a complaint with the State Board of Nursing alleging the health care providers did not appropriately monitor and care for the decedent, causing her death. *Valley Health Sys., LLC*, 497 P.3d at 278. The court in *Valley Health System, LLC* was able to identify an accrual date as a matter of law because the date was "uncontroverted;" the fact the plaintiffs were able to make a professional complaint clearly demonstrated they were on inquiry notice to investigate further. *Winn*, 277 P.3d at 462 (quoting *Day*, 922 P.2d at 539). In the present case, Plaintiffs had no reason to believe they should investigate the Nurse Defendants' actions until they received Defendants' disclosure indicating the Nurse Defendants did not conduct a full intake. Thus, the Nevada Supreme Court's decision in *Valley Health System, LLC* does not control this Court's holding.

Since the Court concludes that the statute of limitations expired on April 28, 2021, Plaintiffs' professional negligence claim is not time-barred. Plaintiffs filed their Amended Complaint on April 26, 2021, and thus their filing was timely. (ECF No. 109 at 36.)

The Court finds Plaintiffs' claim is not time-barred. Defendants cite to an unpublished case, *Valley Health Sys., LLC v. Eighth Jud. Dist. Ct.* 497 P.3d 278 (Table) (Nev. 2021) (unpublished disposition) for the idea that the one-year statute of limitations should apply because they were on inquiry notice as soon as Morgan died. (ECF No. 74 at 20.) However, in that case, the court found that the party was on notice by the date the special administrator for the estate filed a complaint with the State Board of Nursing. *Valley Health Sys., LLC*, 497 P.3d at *2. Plaintiffs differ from the party in *Valley Health* because they never filed a professional complaint nor had any reason to believe the nurses specifically may have played a role in Morgan's death until discovery. (ECF No. 112 at 22-23.) If Defendants' theory prevailed, then Plaintiffs would have had to file a complaint

without any reason to believe the nurses were liable; furthermore, Plaintiffs would have needed to rely on a completely hypothetical expert affidavit to comply with Nevada's professional negligence statute. (*Id.*)

Plaintiffs did not discover Morgan's injury until discovery began. In *Winn*, the court determined that Winn did not discover the injury when it originally occurred because "it is unlikely that an ordinarily prudent person would begin investigating whether a cause of action might exist on the same day as being informed that his or her child's surgery had gone drastically wrong." 277 P.3d at 253. The Court determined, as a matter of law, Winn discovered the injury no later than the date he received the medical records. *Id*; *see also Heinrich v. Ethicon, Inc.*, No. 2:20-cv-00166-CDS-VCF, 2023 WL 3963611 (D. Nev. May 4, 2023) (finding that the statute of limitations in a medical malpractice action did not begin until the receipt of medical records suggesting negligence). Here, Plaintiffs had no reason to suspect the nurses of any negligence until April 6, 2021, when they received discovery disclosures suggesting the nurses did not follow procedures. (ECF No. 112 at 21.) Thus, Plaintiffs had until three years from the date of injury, April 28, 2021, to file their complaint. Since Plaintiffs filed their amended complaint on April 26, 2021, their state law claims are not time-barred. (*Id.* at 21-22.)

### E. QUALIFIED IMMUNITY

#### 1. Nurses Jane Balao, Christopher Shields, and Rosemarie McCrary

The parties further dispute whether Nurses Balao, Shields, and McCrary waived qualified immunity by not raising it in their Motion for Summary Judgment. (ECF Nos. 112 at 2 n.2; 136 at 4-5.) Plaintiffs filed a Motion to Strike the Nurses' joinder motion (ECF No. 135) and their reply to their summary judgment motion (ECF No. 136) because they did not timely file the joinder motion and failed to raise any qualified immunity defense at the summary

judgment stage prior to their reply. (ECF No. 137 at 2-5.) Defendants counter the Court can choose to consider, in its discretion, the qualified immunity argument. (ECF No. 140 at 3-9.) After careful consideration, the Court will not allow the Nurses to make any qualified immunity arguments at the summary judgment stage.

It is well established that "arguments raised for the first time in a reply brief are waived." *Turtle Island Restoration Network v. U.S. Dept. of Commerce*, 672 F.3d 1160, 1166 n.8 (9th Cir. 2012). Because Defendants did not raise qualified immunity as a grounds for summary judgment until their reply, the Court finds they waived consideration of the defense at the summary judgment stage.

While the Ninth Circuit has not ruled on this issue directly, several circuits have recognized that defendants can waive qualified immunity if they fail to raise it during summary judgment proceedings. *See Summer v. Kenton Cnty. Clerk's Office*, 604 F.3d 257, 269-70 (6th Cir. 2010) (refusing to address qualified immunity on appeal when the defendant raised the defense in his answer but not in his motion for summary judgment); *Narducci v. Moore*, 572 F.3d 313, 324-25 (7th Cir. 2009) (affirming the district court's denial of summary judgment based on qualified immunity because the defendants did not raise the defense in their motion for summary judgment); *Angarita v. St. Louis Cty.*, 981 F.2d 1537, 1548 (8th Cir. 1992) (finding that appellants failed to preserve the issue of qualified immunity when they pled it in their answers but never raised it in any pretrial motion or during or after trial); *Thomas v. Wellenreuther*, No. 21-1400, 2022 WL 1026047 (2d Cir. April 6, 2022) (affirming denial of qualified immunity when the defendant plead qualified immunity in his answer but did not move for summary judgment on qualified immunity grounds). At least one district court within the Ninth Circuit has taken the same approach. *See, e.g., Pullano v. No. 8170, CCDC Guard*, No 2:10-cv-00335, 2013 WL 1758999, at *2 (holding that Defendants

1   waived their qualified immunity defense by not raising it during summary

2   judgment). In line with these decisions, the Court holds that Defendants' failure

3   to raise qualified immunity in their summary judgment motion precludes relief

4   on that ground.

5   **2. Nurse Brigado Bayawa**

6   Because Nurse Bayawa raised qualified immunity as an affirmative

7   defense, the Court must consider whether it applies. Qualified immunity shields

8   certain government officials from liability unless their conduct violates "clearly

9   established statutory or constitutional rights of which a reasonable person would

10  have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v.

11  Fitzgerald*, 457 U.S. 800, 818 (1982)). The point of shielding officials from liability

12  except when they violate "clearly established" rights is to "ensure that before they

13  are subjected to suit, officers are on notice their conduct is unlawful." *Id.* (quoting

14  *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). Nonetheless, officials who violate

15  statutory or constitutional rights knowingly or through plain incompetence are

16  not shielded from liability. *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (quoting

17  *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). Thus, if "every 'reasonable official

18  would have understood that what he is doing violates that right,'" then the right

19  is clearly established, and qualified immunity does not provide a defense. *See al-

20  Kidd*, 563 U.S. at 741. For a constitutional or statutory right to be clearly

21  established, there does not need to be a factually indistinguishable case spelling

22  out liability, but existing precedent "must have placed the statutory or

23  constitutional question beyond debate." *Id.*

24  As an initial matter, the Court has already discussed earlier that there is a

25  genuine dispute of material fact as to whether the nurses violated Morgan's rights

26  by providing subpar CPR not in line with their training. Thus, qualified immunity

27  will not apply if the Court also finds that the right to adequate life-saving

28  measures is clearly established. The Court finds such a right is clearly

established. In *Lemire*, the Ninth Circuit held that "[a]s other circuits have held, failing to provide CPR or other life-saving measures to an inmate in obvious need can provide the basis for liability under § 1983 for deliberate indifference." 726 F.3d at 1082 (internal citations omitted). The Ninth Circuit found that a trier of fact could conclude "officers trained to administer CPR who nonetheless did not do so despite an obvious need demonstrated the deliberate indifference required for an Eighth Amendment claim." *Id.* at 1083. While the nurses here provided CPR, they admitted that they did not follow their training or protocol when doing so, leading Morgan not to receive proper CPR for six minutes. (ECF Nos. 112-10 at 108:17-108:25; 112-17 at 51:8-51:17; 112-18 at 52:15-52:22.) A reasonable factfinder could decide that these subpar efforts were little different than doing nothing at all and that the nurses understood Morgan had a right to CPR efforts guided by medical knowledge and training. Thus, the Court will also deny Nurse Bayawa qualified immunity.

## IV. CONCLUSION

It is therefore ordered that Defendants' Motion for Summary Judgment (ECF No. 74) is denied.

It is further ordered that the Nurses' Motion to Strike ECF Nos. 135 and 136 (ECF No. 147) is granted.

It is further ordered that ECF Nos. 96, 152, and 185 are denied as moot. Parties may refile these motions following resolution of the pending appeal before the Ninth Circuit.

DATED THIS 29th day of December 2023.

_____

ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE